STATE of Wisconsin, Plaintiff-Respondent,

v.

Steven M. MILASHOSKI, Defendant-Appellant.†

Court of Appeals

*No. 90–0412–CR. Submitted on briefs August 21, 1990.—Decided November 7, 1990.*

(Also reported in 464 N.W.2d 21.)

† Petition to review granted.

103

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Steven P. Weiss,* assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Donald J. Hanaway,* attorney general, and *Thomas J. Balistreri,* assistant attorney general.

Before Nettesheim, P.J., Brown and Anderson, JJ.

NETTESHEIM, P.J. Steven M. Milashoski appeals from a judgment convicting him of manufacturing a controlled substance contrary to secs. 161.41(1)(b) and 161.14(4)(n), Stats., arguing that physical evidence and crime laboratory analysis presented at trial were obtained in violation of his fourth amendment right to be free from unlawful search and seizure. Milashoski, who was sentenced to five years' imprisonment and a $15,000 fine, also appeals from an order denying his postconviction motion challenging the imposition of the fine.

The issues on appeal are three: (1) whether Milashoski has standing to appeal the propriety of the seizure; (2) whether certain containers of liquids—which were removed from Milashoski's home during the course of a warrantless search, stored at the village of Fontana fire station, and then transferred to the state crime laboratory in Milwaukee for analysis—were obtained in violation of the fourth amendment; and (3) whether the trial court improperly refused to vacate the fine imposed on Milashoski, who is indigent. Based on our review of the record in this case, we reject the state's standing argument, affirm the trial court's denial of Milashoski's motion to suppress, and decline to review the order imposing the fine, as the issue is brought before us prematurely.

104

# I. FACTS

The evidence against Milashoski was obtained by village of Fontana firefighters, some of whom were also police officers, following an explosion and fire at a house Milashoski was occupying on July 3, 1986. After extinguishing a blaze in the kitchen, firefighters saw what appeared to them to be laboratory equipment. Then, after noticing heat underfoot, the firefighters proceeded to the basement, where a second fire was burning. After these flames had been doused, firefighters conducted an "overhaul" of the basement. During an "overhaul," firefighters inspect the premises to make sure the fire is completely extinguished and salvage valuables if requested to do so by the owner.

While engaged in the "overhaul," firefighters again saw what appeared to be laboratory equipment together with five liquid-filled containers in an area near where the fire had just been burning. Of the five containers, two were unmarked, one was labeled "toluene," another "vegetable oil," and another "reagent alcohol." The marked containers held liquids the firefighters knew to be combustible. When Milashoski, who was waiting in a neighbor's yard for medical help to arrive, was asked what had happened, he stated that he had been "boiling some material for perfume and it exploded."

Not knowing what the containers held, or if they were related to the "material for perfume" which Milashoski said had started the fire, firefighters removed all five containers from the house as a precaution against further outbreaks. One firefighter became ill from vapors emitted by the unmarked container he was handling.

The firefighters transferred the five containers to the village of Fontana fire station, as there seemed to be no safe way to leave them with their apparent owner: the

house was damaged; Milashoski had been badly burned and was receiving treatment at a nearby hospital. A village of Fontana police officer assigned to investigate the cause of the fire interviewed Milashoski in the hospital later that day. The officer testified at trial that Milashoski said he neither owned nor knew the nature of the liquids found in the basement.

The containers remained at the fire station over the Fourth of July holiday. After the holiday ended, the containers were shipped to the state crime laboratory in Milwaukee where their contents were analyzed. One of the liquids tested contained concentrations of two controlled substances regulated under chapter 161 of the Wisconsin Statutes: phencyclidine (better known as PCP or "Angel Dust") and 1-piperidinocyclohexane-carbonitrile, which is PCP's immediate precursor in the manufacturing process.

The firefighters did not have a warrant to search the basement after extinguishing the fire. Nor did the firefighters have warrants to move the containers from the basement to the yard, from the yard to the village of Fontana fire station, or from the fire station to the state crime laboratory. Milashoski moved to suppress the physical evidence against him on the grounds that it was obtained in violation of the fourth amendment's prohibition against unreasonable searches and seizures. The trial court denied the motion, and Milashoski was convicted on one count of manufacturing a controlled substance.

Milashoski made postconviction motions renewing the suppression of the evidence issue and challenging the imposition of a fine as part of his sentence. The trial court denied the suppression motion, and declined to set aside the fine, but modified the judgment to allow Milashoski sixty days from his release from prison to

pay the fine, or move the court to assess his contemporary ability to pay.

## II. STANDING

Here on appeal, the state first argues that Milashoski lacks standing to challenge the seizure of physical evidence in this case. The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have alleged a personal stake in the outcome which is at once related to a distinct and palpable injury and a fairly traceable causal connection between the claimed injury and the challenged conduct. *Bence v. City of Milwaukee,* 107 Wis. 2d 469, 479, 320 N.W.2d 199, 203-04 (1982) (quoting *Duke Power Co. v. Carolina Env. Study Group, Inc.,* 438 U.S. 59, 72 (1978)). This court will not construe the law of standing in Wisconsin narrowly or restrictively. *Wisconsin's Envtl. Decade, Inc. v. Public Service Comm'n of Wis.,* 69 Wis. 2d 1, 13, 230 N.W.2d 243, 249 (1975).

The state bases its position on statements Milashoski made to police while in the hospital recovering from the burns he received in the fire. At trial, the interviewing officer testified that when questioned as to the source of the containers, Milashoski said that:

> [a]s far as he could recall they were possibly still down there from before, from the previous owner . . . and his father [who owned the house] hadn't gotten down there to clean out those items.

This statement, according to the state, indicates an affirmative disclaimer of ownership, and hence constitutes an effective abandonment of any privacy interest that Milashoski may have had in the property.

107

Although we agree with Milashoski that if the state were to prevail on its standing argument, it would be in the awkward position of having argued for a result which calls into question the connection between Milashoski and the evidence used to convict him, we decide this issue on the strength of another observation. Milashoski argues that because the state conceded the existence of standing in the trial court, it has forfeited the right to make such an objection here on appeal. We agree. At the suppression hearing, limited testimony on the question of standing was presented. The following exchange then took place between the trial judge and the district attorney:

> THE COURT:   Okay . . .. I don't have the case law in front of me. It seems to me it would establish standing.

> [DISTRICT ATTORNEY]:   I believe that it would, Your Honor.

> THE COURT:   All right. Standing is established.

■■■■

We have permitted a respondent on appeal to offer grounds for affirmance which may be inconsistent with the stand taken at trial. *See State v. Holt,* 128 Wis. 2d 110, 125, 382 N.W.2d 679, 687 (Ct. App. 1985). *Holt,* the seminal case for this proposition, concluded that the state could argue on appeal that there was no error in failing to give an intoxication instruction even though it requested the instruction in the trial court. *Id.* We did so because the principle underlying the waiver rule—efficient judicial administration—was not served by barring a respondent from asserting a valid ground for affirming the trial court ruling. *Id.* at 123–24, 382 N.W.2d at 686.

108

In *Holt,* the question of whether an intoxication instruction should have been given presented a question of law. *See id.* at 126, 382 N.W.2d at 687. We conclude that the *Holt* approach ought not to apply in a case such as this where further fact finding on the underlying question is necessary to a resolution of the issue. In light of the state's concession to standing below, there was no need for either party to develop a full factual basis on the question of Milashoski's ownership of the containers.

Therefore, the only factual predicate upon which we could base a review of standing is the police officer's testimony, set forth above, to the effect that Milashoski said he was not the owner of the containers. The alleged statement of abandonment strikes us as equivocal, at best. We hesitate to tether the abandonment of a constitutional right to statements employing such terms as "possibly" and "as far as he could recall," especially where the declarant was in pain and, according to the officer, under medication.

■■

As noted, the waiver rule is one addressed to the efficient administration of judicial business. *Id.* at 124, 382 N.W.2d at 686. Whether we apply the waiver rule is addressed to our discretion. *Ford Motor Co. v. Lyons,* 137 Wis. 2d 397, 417, 405 N.W.2d 354, 362 (Ct. App. 1987). We may do so where the interests of justice require. *Id.* If the state had not consented to Milashoski's standing to challenge the evidence in the trial court, we would have the benefit of a fully litigated record on the question. Without such a record, we cannot meaningfully address the standing issue. To relax the waiver rule in favor of the state makes no sense and does not serve either the efficient administration of judicial business or the interests of justice. We conclude, there-

fore, Milashoski has standing to challenge the constitutionality of the seizure of physical evidence in this case.

## III. ADMISSIBILITY OF THE EVIDENCE

We turn next to the merits of Milashoski's challenge to the admissibility of physical evidence. We will not disturb rulings on the admissibility of evidence absent an abuse of discretion. *Gonzalez v. City of Franklin*, 137 Wis. 2d 109, 141, 403 N.W.2d 747, 760 (1987). Milashoski does not question the constitutionality of the firefighters' entry into his residence to put out the fire, or their subsequent removal of the containers from the basement to the yard. Milashoski does, however, assert that the fire department officials should have obtained a warrant before transferring the containers from the yard to the fire station, and another warrant before shipping the containers from the fire station to the crime laboratory.

The thrust of Milashoski's argument is that the items were not seizable under the plain-view exception, since their illegal nature was not readily apparent to the firefighters. The state counters that the transfers were accomplished only as a safety precaution pursuant to emergency conditions and that no warrant is necessary in such circumstances. Milashoski responds that the state has failed to show that the safety interest presented in this case comes within any recognized exception to the fourth amendment's prohibition against unreasonable searches and seizures.

### A. The Law Generally

We first state some fundamental law and observations regarding search and seizure. Warrantless searches

are per se unreasonable, and the state bears the burden of proving that the search and seizure at issue falls within one of a few, narrowly-drawn exceptions. *See generally Katz v. United States,* 389 U.S. 347, 357 (1967); *State v. Gonzalez,* 147 Wis. 2d 165, 167–68, 432 N.W.2d 651, 652 (Ct. App. 1988). The list of exceptions has grown with time, and at present it is well established that there are at least ten exceptions under which warrantless searches and seizures may be held valid, viz:

(1)   when the items seized are in "plain view," *see Coolidge v. New Hampshire,* 403 U.S. 443 (1971); *La Fournier v. State,* 91 Wis. 2d 61, 280 N.W.2d 746 (1979);

(2)   when "consent" is freely and voluntarily given, *see Bumper v. North Carolina,* 391 U.S. 543 (1968); *State v. Douglas,* 123 Wis. 2d 13, 365 N.W.2d 580 (1985);

(3)   as "incident to a lawful arrest," *see* sec. 968.11, Stats.; *Abel v. United States,* 362 U.S. 217 (1960); *State v. Tompkins,* 144 Wis. 2d 116, 423 N.W.2d 823 (1988);

(4)   while authorities are in "hot pursuit" or "emergency" situations, *see Warden v. Hayden,* 387 U.S. 294 (1967); *State v. Smith,* 131 Wis. 2d 220, 388 N.W.2d 601 (1986) (under Wisconsin law "hot pursuit" is treated as an aspect of the "exigent circumstances" doctrine.);

(5)   in "stop and frisk" situations, *see Terry v. Ohio,* 392 U.S. 1 (1968); *State v. Washington,* 120 Wis. 2d 654, 358 N.W.2d 304 (Ct. App. 1984);

(6)   while authorities are engaged in the "community caretaker function," *see State v. Anderson,* 142 Wis. 2d 162, 417 N.W.2d 411 (Ct. App. 1987);

(7)   where "exigent circumstances" exist, *see Chambers v. Maroney,* 399 U.S. 42 (1970); *State v. Peardot,* 119 Wis. 2d 400, 351 N.W.2d 172 (Ct. App. 1984);

(8)   under the "open fields" doctrine, *see State v. Peck,* 143 Wis. 2d 624, 422 N.W.2d 160 (Ct. App. 1988);

(9) inventory searches of impounded vehicles, *see State v. Axelson,* 149 Wis. 2d 339, 441 N.W.2d 259 (Ct. App. 1989); and

(10) border and customs searches, *see United States v. Odland,* 502 F.2d 148 (7th Cir.), *cert. denied,* 419 U.S. 1088 (1974).

These exceptions are not inherently different in character; rather, each presents a means by which the reasonableness of a given search and seizure may be assessed and described. *See, e.g., United States v. Humphrey,* 409 F.2d 1055, 1057 (10th Cir. 1969). Moreover, these exceptions share familiar justifications, such as the need to protect the authorities involved, prevent escape, preserve evidence, or thwart delay which might permit the commission of a crime. *Id.* Not surprisingly, distinctions between these exceptions often blur. The present action is such a case.

## B. The Law Applied In This Case

We move now to the key question in this case: whether village of Fontana fire authorities could, without warrant, conduct some inspection or testing of the items to determine their properties. The state rests its contention on two bases: (1) a provision in the Agriculture, Trade and Consumer Protection Code, which provides for the testing of potentially hazardous substances in the interests of protecting public health and safety; and (2) case law addressing several of the exceptions listed above. As to the latter, we understand the state to say that this is properly an "emergency" case, and that each successive event following the fire becomes subsumed in, and immunized by, the initial emergency.

Milashoski, on the other hand, characterizes this as a plain view case. He argues vigorously that officials

112

suspected illegal activity from the start and that safety considerations were merely a veneer on what was really a criminal investigation. Milashoski seems to imply that when facts of a warrantless search case are susceptible of criminal suspicion, either apart from or in addition to other interpretations, evidence seized must be evaluated in terms of the plain view exception.

We need not look so far afield as the Agriculture, Trade and Consumer Protection Code to decide the case at bar, as the state suggests. And, while Milashoski's cited authorities provide the requisite guidance, we cannot agree that they suggest plain view to be the only exception applicable to, or dispositive of, this action. Furthermore, we conclude that even if, arguendo, village of Fontana fire officials were motivated by safety concerns *and* a desire to conduct a criminal investigation, the safety concerns presented were sufficient in and of themselves to immunize the seizure, and any investigatory motives immaterial to such a result.

### 1. Plain View/Emergency/Exigent Circumstances

Although Milashoski does not contest the initial removal of the items from the fire site, we deem this a necessary starting point for our discussion. Plain view analysis features a three-pronged inquiry: whether the searching officials had a right to be where they were, whether the evidence was inadvertently discovered, and whether the criminal nature of the evidence was readily apparent. *Gonzalez,* 147 Wis. 2d at 168, 403 N.W.2d at 652. The plain view doctrine can apply to searches and seizures conducted both with and without a warrant. *See id.; State v. Elam,* 68 Wis. 2d 614, 229 N.W.2d 664 (1975). But where plain view is urged as a response to a warrantless search, it must go hand-in-hand with

another exception such as an "emergency" or "exigent circumstances." *Coolidge,* 403 U.S. at 465–68. In other words, one of the exceptions to warrantless searches and seizures *other than* plain view must be used to establish the existence of the first element in plain view, namely, whether officials had a right to be on the premises.

Herein lies the source of much confusion. Unfortunately, many of the authorities upon which the parties and this court rely use the terms "exigency" and "emergency" interchangeably. Furthermore, while we do not agree with Milashoski that this action ought to be characterized as a plain view case, we do agree that the plain view authorities he cites offer the most appropriate sources of guidance.

We begin by noting that it is a matter of well-settled law that a burning building presents an emergency of sufficient proportions to render a warrantless entry "reasonable." *Michigan v. Tyler,* 436 U.S. 499, 509 (1978). Again, Milashoski does not take exception to the entry into the house by firefighters, or to the removal of the containers to the yard. However, Milashoski apparently sees the fire as the initial "emergency" which satisfies the first element of the plain view test. From this, he argues that because the firefighters did not know what the liquids in the containers were, their criminal nature could not have been "readily apparent," and any claim of exception under plain view analysis thus is defective for want of this necessary third element of plain view law.

Milashoski relies on a plain view decision of this court, *State v. Gonzalez,* 147 Wis. 2d 165, 432 N.W.2d 651 (Ct. App. 1988), and several federal circuit decisions to support his argument that the seizure was defective under plain view analysis. In *Gonzalez,* after a fire was under control, a firefighter was checking to see if fire had

spread to an upstairs apartment when he spied a sawed-off shotgun. Believing it to be an illegal firearm, the firefighter sought out a police officer, who seized the gun together with other contraband in plain view in Gonzalez' apartment. *Id.* at 167, 432 N.W.2d at 652. We held that the search and seizure were constitutional under the plain view exception, reasoning by reference to the so-called "render safe" rationale employed in federal circuit law, that the firefighter was entitled to call in help to ascertain their (the firearms) significance and to dispose of them properly. *See id.* at 170–72, 432 N.W.2d at 653–54. However, we noted in a footnote that *Gonzalez* did not present a situation where the illegal nature of the evidence seized was apparent to the police, but not to the firefighter who made the initial sighting. *Id.* at 169 n.1, 432 N.W.2d at 653.

Milashoski seizes upon this observation to argue that where the facts are as our hypothetical observation suggested—i.e., the firefighters do not recognize the illegality of the evidence confiscated, but police personnel subsequently consulted do—the opposite result should obtain. We believe this reading of *Gonzalez* presumes the substance of a ruling we have yet to make. We address this consideration in the ensuing discussion.

## 2. "Render Safe"

We turn now to the official action of which Milashoski complains—the warrantless submission of the materials for testing and analysis. We conclude that although Milashoski's authorities are plain view cases, the "render safe" rationale which drives their results is equally applicable to the present situation, and indicates that the judgment must stand. More specifically, we conclude that the "render safe" rationale, which has hereto-

fore been used only in plain view cases, may be equally applicable in certain "emergency" cases. ■■

In essence, the "render safe" rationale is a recognition that while some fact settings present what might otherwise be construed as multiple searches and seizures, they can be properly characterized as single, albeit extended, episodes for the purposes of obtaining a warrant and the admission of evidence. *See, e.g., United States v. Urban,* 710 F.2d 276 (6th Cir. 1983); *United States v. Callabrass,* 607 F.2d 559 (2d Cir. 1979), *cert. denied,* 446 U.S. 940 (1980). The substance of the "render safe" doctrine, as demonstrated by these authorities, provides that an owner forfeits any reasonable expectation of privacy that may inhere in his or her property when it is discovered by authorities responding to an emergency, and the property is either known to be dangerous or believed potentially dangerous to the investigating authorities or the public.

In *Callabrass,* fire broke out in a house suspected by DEA agents to harbor a "drug factory." New York City firefighters searched for victims following the fire. During the course of their search, firefighters found chemicals, vials and scales in the kitchen. The owner of the house was nowhere to be found. Firefighters did not know what chemicals the bottles contained, so they called in police experts to identify them and assist in their removal. The first officers on the scene also could not identify the chemicals. A police narcotics detective finally determined that the chemicals were volatile. And, because it was midwinter and the windows and doors were broken and open as a result of the blaze, the detective feared the bottles holding the chemicals might freeze, and either break open or leak. The bomb squad was summoned and, sometime later, removed the bot-

tles. Neither the firefighters nor the police had a warrant. The chemicals were related to the manufacture of PCP. *Id.* at 561–62. Callabrass was convicted accordingly, and on appeal argued that the investigation was a ruse; that firefighters were merely stalling until a narcotics officer could arrive on the scene to preserve evidence so that it could be used against him. *See id.*

In holding that the warrantless search and seizure of the chemicals did not render them inadmissible at trial, the Second Circuit observed that:

> [t]he exigency in the case at bar was not only limited to the ephemeral nature of the evidence. There was also a need to dispose of the dangerous chemicals quickly so as to render the premises safe.

*Id.* at 564.

The instant case is strikingly similar to *Callabrass* in certain respects: the owner was not available to take custody of the items;[1] the authorities did not know the specific chemical nature of the materials; and the fire site was not in a condition where it could be secured against theft. In addition, here someone had actually become ill as a result of contact with the chemicals.

Property removed from a fire scene, absent a different turn of events, presumably will be returned to the owner or the fire site. Where such property is suspected of contributing to the fire and has additionally rendered someone who handled it ill, we see nothing unreasonable or violative of the constitution when, without a search

---

[1]In *Callabrass,* the owner was not at home at the time of the fire. Here, the authorities knew where Milashoski was, but they also knew that he was a hospitalized burn patient, and, as such, was in no condition to take custody of potentially volatile and harmful chemicals.

warrant, the authorities submit the property to further analysis so that an intelligent decision regarding its *safe* disposition can be made. Rather, such action strikes us as prudent and necessary. Indeed, a failure to so act prior to return of the property may well be irresponsible.

Milashoski's reasonable expectation of privacy cannot be the sole criterion for the constitutionality of the official action here. We must factor into our consideration the conditions that confront the searching officials. *Tyler,* 436 U.S. at 510 and n.6. We conclude that it would be wholly unreasonable to expect officials to safely store and dispose of substances in the absence of the very information necessary to accomplish that goal.

Nor are we persuaded that the authorities' concurrent suspicion of criminal activity by Milashoski deprived them of the ability to pursue their "render safe" activities. Although the materials were suspected as evidence of criminal activity, they also were independently believed to be volatile and harmful to health. We conclude that the fourth amendment permits officials to act reasonably in the face of actual or potential danger, not to ignore it. Even if village of Fontana fire officials had criminal investigation on their minds, this did not neutralize the genuineness of these "render safe" concerns.

Thus, we hold that the fire officials' actions were justified as a continuing "render safe" response to the emergency created by the fire itself. *Urban,* 710 F.2d at 279.

## IV. THE FINE

Finally, we decline to review Milashoski's argument that because he was indigent at the time of sentencing, it was error for the trial court to have imposed a $15,000

fine—the maximum fine. The state concedes that Milashoski is presently unable to pay the fine. However, the state also contends that, by modifying the judgment to allow Milashoski up to sixty days from his release from prison to either pay the fine or seek reduction in the amount, the trial court in effect imposed an indeterminate fine. We agree. An indeterminate fine presents a matter of hypothetical fact. We do not address such questions. *Pension Management, Inc. v. DuRose,* 58 Wis. 2d 122, 128, 205 N.W.2d 553, 555–56 (1973). It is not inconceivable that subsequent events could materially bear upon Milashoski's ability to pay the fine. We should not prematurely relieve him of this portion of the sentence.

*By the Court.*—Judgment and order affirmed.