STATE of Wisconsin, Plaintiff-Respondent,†

v.

Dean JOHNSTON, Defendant-Appellant.††

Court of Appeals

*No. 92–1857–CR. Submitted on briefs May 18, 1993.—Decided June 23, 1993.*

(Also reported in 503 N.W.2d 346.)

†Petition to review filed.
††Petition to cross review filed.

20

23

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Keith A. Findley*, assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *John M. Daniels*, assistant district attorney, *James E. Doyle*, attorney general, and *Stephen W. Kleinmaier*, assistant attorney general.

Before Nettesheim, P.J., Anderson and Snyder, JJ.

ANDERSON, J. Dean Johnston appeals from a judgment of conviction on one count of selling alcoholic beverages to underage persons in violation of sec. 125.07(1), Stats., and one count of evading the law by giving away fermented malt beverages contrary to sec. 125.315(1) and (2), Stats., both misdemeanors. Johnston was also found guilty of a civil forfeiture violation for selling malt beverages without a license, contrary to sec. 125.04(1) and (3), Stats. Johnston argues the following on appeal: (1) that the warrantless search of his home and the subsequent seizure of evidence by uniformed police officers violated his fourth amendment right to privacy, (2) that the evidence cannot support his conviction on both criminal misdemeanor counts, (3) that the state improperly included the civil forfeiture claim in the criminal complaint, and (4) that the trial court erred in denying his motion for sentence

modification, which was based upon his change in behavior after sentencing. Because we conclude that the warrantless search was a violation of Johnston's fourth amendment right to privacy, we reverse the judgment of the trial court and remand for a new trial.

## FACTS

In an attempt to gain access to illegal bars operating in the vicinity of the University of Wisconsin-Oshkosh campus, Oshkosh police assembled an undercover unit comprised of several officers. These officers were to infiltrate campus parties at which beer was being sold illegally. Johnston's residence was targeted based upon reports from campus police of illegal beer sales at that location.

The officers in the undercover unit attempted on several occasions to access Johnston's residence, but were denied entry when no one at the home recognized them. On the evening of April 3, 1991, they again attempted to enter Johnston's home with the help of a civilian, Roger Holtmeier, who knew Johnston's brother.

The officers' plan was to enter the home and purchase beer with marked bills. If they discovered any illegal activity, they were to remain inside. This would effectively signal a back-up team of uniformed officers to enter the premises approximately fifteen to twenty minutes later in order to search the residence and make any necessary arrests. There was no contingency plan to obtain a warrant before the uniformed officers' entry. An emergency plan was devised in case the undercover team encountered any danger. The plan consisted of providing one of the undercover officers with a portable radio should the team need to call for help.

The undercover team first attempted to enter Johnston's residence at approximately 6:15 p.m. Holtmeier informed residents of the home that he was acquainted with Johnston's brother. The officers were then informed to return in an hour. Upon their return at approximately 7:20 p.m., the officers were admitted through the back door of the residence and went to the basement. They estimated that between fifteen and twenty people were present, and that ultimately the party increased to approximately fifty persons.

Johnston asked the officers for identification and each officer paid Johnston three dollars in marked bills and received a beer glass. Johnston told some officers that they were paying the money for the cups and others that the money was for the music. They helped themselves to beer and joined in a dice game. At one point Johnston asked an officer if he was a police officer because he seemed unfamiliar with playing dice. The officer responded that he was not. At trial he testified that he felt it would have been detrimental to his safety to disclose his identity because there were forty to fifty people present.

After approximately fifteen minutes, the uniformed officers surrounded the residence. Two of the officers then proceeded to enter through the back door and into the basement where they conducted a search of everyone's identification and subsequently seized several beer signs, beer glasses, a roll of tickets, and two barrels of beer—one of which was half empty and the other full. In addition, the officers recovered several of the marked bills, including those in Johnston's possession.

Prior to trial, Johnston moved to suppress the evidence seized and statements made during the police raid on his home. He contested both the undercover

officers' and the uniformed officers' warrantless entries and searches.[1] At the suppression hearing, Captain David Erickson testified that the police did not obtain a warrant because they did not believe that there was time to obtain one. He explained that it normally takes about two to three hours to have a search warrant issued and that he believed the beer would be gone, the party broken up and the marked bills dispersed by the time it could be obtained. There was no testimony regarding the time needed to obtain a telephone warrant pursuant to sec. 968.12(3), Stats. The trial court denied the motion to suppress, based in part on its holding that exigent circumstances existed justifying a warrantless entry. The court identified the exigent circumstances as the possible destruction of evidence and the protection of the safety of the officers. Johnston was subsequently convicted at trial of all three counts.

## SEARCH AND SEIZURE WITHOUT A WARRANT

■

We first address the issue of whether the warrantless search of Johnston's home violated his constitutional right to privacy under the fourth amendment to the United States Constitution and art. I, § 11 of the Wisconsin Constitution. The historical facts are undisputed. The questions remaining are ones of constitutional fact, which are reviewed independently by the appellate court as a conclusion of law. *State v. Lange,* 158 Wis. 2d 609, 617, 463 N.W.2d 390, 393 (Ct. App. 1990).

---

[1] Johnston concedes on appeal that the undercover officers' entry was lawful under *Lewis v. United States,* 385 U.S. 206 (1966). Consequently, he challenges only the admission of the evidence seized by the uniformed officers.

Under the fourth amendment to the United States Constitution and art. I, § 11 of the Wisconsin Constitution, warrantless searches are per se unreasonable except under certain well-defined circumstances. *State v. Milashoski,* 159 Wis. 2d 99, 110–11, 464 N.W.2d 21, 25–26 (Ct. App. 1990), *aff'd,* 163 Wis. 2d 72, 471 N.W.2d 42 (1991); *see generally Katz v. United States,* 389 U.S. 347, 357 (1967). The exceptions to the requirement that a search be conducted with a warrant include instances where the occupant consents to a search of the premises, where probable cause for a search is attended by exigent circumstances, or where emergency situations exist. *Milashoski,* 159 Wis. 2d at 111, 464 N.W.2d at 26. The state has the burden of proving that the search and seizure fall within one of the exceptions. *Id.*

The state contends that Johnston lacks standing to challenge the warrantless search because he consented to the search of his home by inviting guests to enter. In *Rakas v. Illinois,* 439 U.S. 128, 139 (1978), the Supreme Court declined to conduct a separate inquiry into a defendant's standing to challenge a search and focused instead on "the extent of a particular defendant's rights under the Fourth Amendment." Therefore, the issue becomes whether Johnston possessed a legitimate expectation of privacy.

The state argues that Johnston waived his fourth amendment right to privacy by effectively converting his home into a commercial center and selling beer to invited guests. The state relies on *Lewis v. United States,* 385 U.S. 206, 211 (1966), in which the Supreme Court held:

> [W]hen, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store . . . or on the street. A government agent . . . may accept an *invitation* to do business and may enter upon the premises for the very purpose contemplated by the occupant. [Emphasis added.]

*Lewis,* however, dealt with the express invitation of a government agent to enter the petitioner's home. In the case at bar, Johnston concedes the legality of the entry of the undercover officers who were expressly invited into the party. It is the subsequent entry of the uninvited uniformed officers and the seizures which they made that he challenges.

The state asserts, however, that the consent by invitation given to the undercover officers extended to the uniformed officers vicariously; the uniformed officers entered Johnston's residence merely to assist the undercover team in seizing the evidence. In support of this argument, the state relies upon the doctrine of "consent once removed," adopted by the Court of Appeals for the Seventh Circuit and the Eastern District of Virginia. *See United States v. Diaz,* 814 F.2d 454 (7th Cir.), *cert. denied,* 484 U.S. 857 (1987); *United States v. Paul,* 808 F.2d 645 (7th Cir. 1986); *United States v. Janik,* 723 F.2d 537 (7th Cir. 1983); *United States v. Samet,* 794 F. Supp. 178 (E.D. Va. 1992). *See also United States v. Anhalt,* 814 F. Supp. 750 (N.D. Ill. 1993); *United States v. One (1) 1984 Mercedes Benz,* 673 F. Supp. 387 (D. Haw. 1987); *California v. Cespedes,* 236 Cal. Rptr. 649 (Cal. Ct. App. 1987); *Pennsylvania v. Moye,* 586 A.2d 406 (Pa. Super. Ct. 1990).

A general principle in Wisconsin is that additional officers may enter an individual's home after one officer has been legally admitted provided that they do not expand the scope or intensity of the search. *See State v. Pires,* 55 Wis. 2d 597, 604–05, 201 N.W.2d 153, 157–58 (1972); *see also La Fournier v. State*, 91 Wis. 2d 61, 71, 280 N.W.2d 746, 751 (1979). Expanding the scope of the search includes searching for evidence beyond that which has been inadvertently viewed by the officers during the initial search. *See Pires,* 55 Wis. 2d at 606–07, 201 N.W.2d at 158; *La Fournier*, 91 Wis. 2d at 69 & n.8, 280 N.W.2d at 750. By entering Johnston's home and conducting a search of each person's identification, the back-up officers expanded the original search beyond what the undercover team had witnessed inadvertently and in plain view.

Moreover, the back-up unit entered under a predetermined plan to seize evidence without any indication that it was necessary for them to do so. In *La Fournier*, an officer legally entered the premises of an overdose victim and radioed for subsequent back-up help because he was unable to seize drug paraphernalia on his own while rendering aid to the victim. *La Fournier*, 91 Wis. 2d at 65, 280 N.W.2d at 748. Only then did the additional officers enter the premises. Likewise, in *Pires,* back-up officers were signaled only after it was determined that help was needed.

In the absence of any known necessity to enter Johnston's home, the back-up unit's entry was not to render necessary assistance to the undercover team. Rather, the purpose of the entry was to conduct a search extending beyond that which the undercover team was capable of conducting itself. In so holding, we

decline to adopt the Seventh Circuit's doctrine of "consent once removed." Under the circumstances of this case, that doctrine would allow officers to bypass the limits espoused in *Pires* which were carefully drawn by our supreme court to protect persons from unreasonable searches and seizures without a warrant.

Alternatively, the state argues that the emergency rule exception applies because the undercover officers would have been in danger if discovered. In addition, the state asserts that the warrantless search was justified because exigent circumstances existed due to the possibility that evidence might be destroyed. We disagree.

Warrantless entry is allowed under the emergency rule exception where police have a reasonable belief that a person is in need of immediate aid or assistance. *State v. Boggess,* 115 Wis. 2d 443, 450, 340 N.W.2d 516, 521 (1983). Determining whether a search is valid based upon the belief that emergency circumstances exist requires a two-step analysis. *Id.* at 450–51, 340 N.W.2d at 521. It must first be determined that the officer was motivated by a perceived need to render aid, *id.* at 450, 340 N.W.2d at 521, and secondly, that a reasonable person, under the totality of the circumstances, would have concluded that there was an immediate need to give aid to a person due to actual or threatened physical injury and immediate entry was necessary to render such aid. *Id.* at 452, 340 N.W.2d at 522.

The state fails to meet the requirements of the *Boggess* test. Nothing indicates that the uniformed officers were motivated by the need to render aid. Instead, the record reflects that the officers operated

from a preconceived plan whereby they were to enter Johnston's home if illegal activity was discovered, regardless of whether exigent circumstances existed. Moreover, the uniformed officers had no reason to form a reasonable belief that the undercover team was in need of emergency assistance. The team was comprised mainly of trained officers capable of defending themselves in emergency situations. On their own volition they entered a party of approximately forty to fifty college students with their identities concealed and no reason to believe that they would not remain so. The potential offenses which were being investigated were nonviolent misdemeanors and civil forfeiture violations. There was no reason to believe that weapons were present or that the college students could be potentially dangerous. If, however, the officers did encounter any need for emergency assistance, they were to radio the back-up unit for help. This was an unequivocal signal that assistance was needed. No call was made. Based upon this evidence we conclude that the uniformed officers had no reason to form a belief that emergency circumstances existed.

Finally, the state contends that exigent circumstances existed because the officers feared the immediate destruction of evidence. Warrantless entry may be permissible when there is no time to secure a warrant and there is a compelling need for official action. *State v. Peardot,* 119 Wis. 2d 400, 404, 351 N.W.2d 172, 175 (Ct. App. 1984). The imminent danger of removal or destruction of evidence is well recognized as a circumstance which may permit immediate police action. *Id.* Unlike the emergency exception, the test for the exigent circumstances exception is an objective one: whether a police officer under circumstances

known to the officer at the time reasonably believes that delay in procuring a warrant would risk destruction of evidence. *State v. Bohling,* 173 Wis. 2d 529, 538, 494 N.W.2d 399, 402 (1993).

The state draws a comparison between the facts of this case and those in *Peardot* where officers legally seized, without a warrant, evidence consisting of marked bills used to purchase illegal drugs. We disagree. In *Peardot,* a citizen informant used marked currency to purchase LSD from a middleman who passed the bills on to the defendant. The court found exigent circumstances existed because the marked bills were the best evidence linking the defendant to the crime, and it was feared that they might be dispersed before police could obtain a proper warrant. *Peardot,* 119 Wis. 2d at 404, 351 N.W.2d at 175.

In this case, however, the marked bills were not the best evidence linking the defendant to the crime. Rather, the state's case relied upon the beer barrels and the testimony of the undercover officers who dealt directly with Johnston. Certainly the testimony of the officers was not going to be disposed of before a search warrant was obtained, and the possibility that Johnston would be able to remove the beer barrels from the premises with the house surrounded by uniformed officers was remote. Moreover, the argument that the barrels had to be seized before they were emptied is unpersuasive considering that the contents of the barrels could be determined any number of ways, including testimony of the undercover officers, the stenciled codes on each barrel, or remnants in discarded cups.

*Peardot* was decided prior to the amendments to the telephonic warrant procedure, sec. 968.12(3), Stats. *See* Wis. S. Ct. Order, 141 Wis. 2d xxix (Oct. 29, 1987). The amendments eliminated the preference for written affidavits as the basis for search warrants. *See* Judicial Council Note, 1988, sec. 968.12. The use of a telephonic warrant provides a means for faster response by law enforcement officials and minimizes the resort to warrantless searches when circumstances might otherwise be exigent. *See id.; see also Bohling,* 173 Wis. 2d at 551 n.7, 494 N.W.2d at 408 (Abrahamson, J., dissenting).

Although we decline to follow the Seventh Circuit in the "consent once removed" doctrine, the circuit's comments regarding the availability of telephonic warrants in the context of the exigent circumstances exception are instructive. In *United States v. Patino,* 830 F.2d 1413 (7th Cir. 1987), an FBI agent recognized a burglary suspect outside of an apartment building. The agent radioed for back-up. Three agents responded who were thirty minutes away. When the agents arrived, two guarded the back exit, while the other two entered the apartment from the front without a warrant and arrested the suspect. The court held that exigent circumstances did not exist because during the thirty-minute wait for reinforcements, the agent did not attempt to obtain a telephonic search warrant. *Id.* at 1416. The court noted that even if the warrant process took longer than thirty minutes, the four agents could have discreetly watched the exits and arrested the suspect if he left the building while they waited. *Id.* The court concluded that "[t]o allow resort to 'exigent circumstances' when there is time to obtain a warrant defeats this important constitutional safeguard

36

against unreasonable searches and seizures." *Id.* at 1417.

These circumstances are very similar to, and perhaps less compelling, than those surrounding Johnston's arrest. Uniformed officers had Johnston's building surrounded and could have stopped those persons leaving the party. Likewise, the police could have prevented the removal of the kegs. The officers knew that Johnston's party had just started so it was not likely that it would end soon. The earliest estimated ending time testified to was 9:00 p.m., over an hour and one-half after the undercover officers' entry and two and one-half hours after their initial approach of the residence. The uniformed officers waited fifteen minutes from the time of the undercover officers' entry before their entry, during which time there was no indication from the officers inside that time was of the essence. Furthermore, their prearranged plan had no provisions to attempt to obtain a warrant. It must be remembered that "exigent circumstances" are the *exception* to the rule that warrantless searches are illegal; the doctrine of "exigent circumstances" assumes that it is not practicable to use the warrant procedure. The state has not shown that a warrant could not have been procured or that it was even considered. We cannot hold that exigent circumstances existed under this set of facts. Consequently, we conclude that the uniformed officers' search was unlawful and the items seized by them should have been suppressed. We reverse and remand for a new trial without the benefit of this evidence.

37

## INCONSISTENCY OF CHARGES AND JOINDER OF A CIVIL FORFEITURE TO CRIMINAL ACTION

Although we reverse on the first issue, we address the second and third issues raised by Johnston because they are likely to be contested again upon remand. Johnston contends that the criminal misdemeanor charges were inconsistent. Count one of the criminal complaint alleges that Johnston unlawfully *sold* fermented malt beverages in violation of sec. 125.04(1), Stats., while count three alleges that he unlawfully *gave away* fermented malt beverages in violation of sec. 125.315(1), Stats.[2] The thrust of Johnston's argument is that the evidence is insufficient to support a finding that he illegally sold beer and illegally gave beer away at the same time.

In reviewing the sufficiency of the evidence to support a judgment entered on a jury verdict, the appellate court must view the evidence in a light most favorable to the verdict. *State v. Poellinger,* 153 Wis. 2d 493, 501, 451 N.W.2d 752, 755 (1990). This court must affirm unless that evidence is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. *Id.*

---

[2] Section 125.04(1), Stats., provides: "No person may sell, manufacture, rectify, brew or engage in any other activity for which this chapter provides a license, permit, or other type of authorization without holding the appropriate license, permit or authorization issued under this chapter."

Section 125.315(1), Stats., provides: "No person may give away any fermented malt beverages or use any other means to evade any law of this state relating to the sale of fermented malt beverages."

Of the five witnesses who testified to giving Johnston money, only one officer stated unequivocally that Johnston told her that the money was for the purchase of a beer glass. Two other officers testified that Johnston expressly stated to them that the money was for the payment of the music being played. Johnston did not tell the remaining witnesses what they were paying for, but Holtmeier stated that he assumed it was for a beer glass. Based upon the testimony of these witnesses, and viewing the evidence in a light most favorable to the verdict, we conclude that the jury had credible evidence upon which to find that Johnston was selling beer to some individuals while giving it away to others.

We next address Johnston's argument that the state improperly joined a civil forfeiture count in the criminal complaint. Count two of the complaint, alleging that Johnston sold alcoholic beverages to underage persons in violation of sec. 125.07(1), Stats., is punishable only by forfeiture. Conduct punishable only by forfeiture is not a crime under sec. 939.12, Stats.

Section 805.18(2), Stats., provides:

> No judgment shall be reversed or set aside or new trial granted in any action or proceeding . . . for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has *affected* the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial. [Emphasis added.]

Thus, the joinder must have *affected* some substantial right of Johnston in order to secure a new trial. Assum-

ing *arguendo* that joinder was improper, we hold that such error did not affect any of Johnston's substantial rights.

Johnston argues in his brief that "a whole variety of procedural rules, different than those applied [in a criminal case], should have governed the proceedings on [the forfeiture count]." Specifically, he contends that the burdens of proof were commingled, which "undermined the force of the reasonable doubt requirement" of the misdemeanor counts.

Subsequent to instructing the jury on counts one and two, the trial judge stated:

> Let me just add here. I hope you notice there is a different burden of proof as to count number two than as to count number one. Count number one would be beyond a reasonable doubt. Count number two is to a reasonable certainty by evidence which is clear, satisfactory and convincing.

Finally, upon instructing the jury as to count number three, the trial judge alerted the jury to the fact that the burden of proof was identical to that of count number one, but not count number two comprising the forfeiture claim. At no time were the burdens of proof "commingled." The jury was instructed as to each element of each count and informed of the burden of proof applicable to each element. Juries are presumed to follow the instructions given to them. *State v. Hubanks,* 173 Wis. 2d 1, 20, 496 N.W.2d 96, 102–03 (Ct. App. 1992). Because Johnston has presented no facts to overcome this presumption, we conclude that the joinder did not affect his right to be tried under the correct burden of proof.

40

*By the Court.*—Judgment and order reversed and cause remanded with directions.