STATE of Wisconsin, Plaintiff-Respondent,

v.

Rick R. ROME, Defendant-Appellant.†

Court of Appeals

*No. 00–0796–CR. Submitted on briefs September 20, 2000.—Decided October 18, 2000.*

## 2000 WI App 243

(Also reported in 620 N.W.2d 225.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *William E. Schmaal*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *William C. Wolford*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Brown, P.J., Anderson and Snyder, JJ.

¶ 1. SNYDER, J. Rick R. Rome appeals from a judgment of conviction for manufacturing marijuana. Rome asserts that the trial court erred when it denied his motion to suppress evidence found in his closet. Rome argues that the police entry into his home and closet was not justified by emergency circumstances because the police officer was not solely motivated by a perceived need to render immediate aid or assistance. We conclude that the police entry into both the home and the closet was justified by emergency circumstances and affirm the judgment of conviction.

## FACTS

¶ 2.    On December 1, 1998, at approximately 2:00 a.m., Officers Emmett Grissom and E.A. Sutherland of the Village of Grafton Police Department saw a woman walking on the street carrying a baby. The woman was crying and very upset. Because it was December and the weather was cold and windy, Grissom stopped his patrol car and asked the woman why she was crying and why she was out in those conditions late at night. The woman stated that she had had an argument with her husband and was walking to her brother-in-law's home. The woman insisted that she did not want any police assistance in the matter.

¶ 3.    Grissom gave the woman and the baby a ride to her brother-in-law's home. During the ride, the woman identified her husband as Rome. The woman stated that Rome was at their home and had been drinking. The woman reported that Rome had been yelling and threatening her during an argument about the children, and that at one point Rome had grabbed her hair. The woman insisted that Rome would never hit her and that she did not want any police involvement. When Grissom informed her that he needed to talk to Rome about this incident, she stated that Rome was at home, intoxicated, with her two-year-old daughter. The woman insisted that the child had been fine, asleep in her bedroom, when she had left the house only ten or fifteen minutes earlier. Nevertheless, she did acknowledge that she was concerned about the child's welfare because Rome was drunk and probably did not know that she had left the house; she asked the police to go to her house and check on her daughter. However, the woman did not give the police permission to enter her home.

¶ 4.   Grissom and Sutherland then went to the Rome home, where they met with two other police officers. The officers rang the doorbell for one or two minutes but received no response. The officers then knocked on the outer door of the house, which swung open by itself into an enclosed porch. The officers noticed an interior door down the hallway which led inside the house. When the officers approached the interior doorway, they noticed that the door was open a few inches. The officers swung the interior door open and called out for Rome to come and talk with them. Although the officers shouted "at the top of [their] lungs" for "well over 10 minutes," no one responded and they heard no noise from elsewhere in the house. The officers asked the police dispatcher to call the Rome residence on the phone to see if someone would come to the door, but the dispatcher informed the officers that the phone had been disconnected.

¶ 5.   The officers then entered the kitchen area of the house and continued to call out for another five minutes but without response. While Grissom waited in the kitchen to keep an eye on the basement stairs, Sergeant Dennis Kasprzak and Sutherland went to the base of the stairs going upstairs and shouted for another minute or so. Kasprzak and Sutherland then went upstairs.

¶ 6.   Upstairs, Kasprzak and Sutherland found Rome asleep on a bed in one of the bedrooms; they called out his name and startled him. While Kasprzak and Sutherland placed Rome in handcuffs for safety reasons, Kasprzak noticed a light flickering beneath the closed closet door. Kasprzak believed that the two-year-old child might be hiding in the closet because of the excessive shouting by the police officers. Kasprzak

opened the closet door and found, instead of the child, a makeshift greenhouse and a marijuana plant.

¶ 7. At the same time, after hearing that Kasprzak and Sutherland had found Rome, Grissom went upstairs and saw Kasprzak and Sutherland handcuffing Rome. He then went to look in other rooms for the two-year-old child and found her asleep in a bedroom. When Grissom returned to the bedroom where Kasprzak and Sutherland were with Rome, Kasprzak showed him the marijuana plant in the closet.

¶ 8. Rome was charged with one count of manufacturing marijuana. The criminal complaint alleged that Rome had grown less than 500 grams of marijuana in a bedroom closet. Rome filed a pretrial motion to suppress the evidence obtained as a result of the search of his home, claiming that the marijuana found in his closet was obtained through an unlawful warrantless search of his home.

¶ 9. An evidentiary hearing was held on Rome's suppression motion. The trial court denied the suppression motion, finding that the officers did not have consent to enter the premises but that their entry and search of the bedroom closet were justified by the "exigencies" related to the safety of the two-year-old child. Rome then pled no contest to the charge. Rome appeals the trial court's denial of his suppression motion.

## DISCUSSION

██

¶ 10. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The Wisconsin Constitution is essentially the same. *See* WIS. CONST. art. I, § 11. Warrantless searches "are per se unreasonable under the fourth amendment, subject to a few carefully delineated exceptions" that are "jealously and carefully drawn." *State v. Boggess*, 115 Wis. 2d 443, 449, 340 N.W.2d 516 (1983) (citation omitted).

¶ 11.  The list of carefully drawn exceptions has expanded over time and presently there are at least ten exceptions under which warrantless searches and seizures may be valid: (1) when the evidence seized is in plain view; (2) when consent is freely and voluntarily given; (3) as incident to a lawful arrest; (4) while authorities are in hot pursuit or during emergency situations; (5) during stop-and-frisk situations; (6) while authorities are engaged in their community caretaker function; (7) where exigent circumstances exist; (8) pursuant to the open fields doctrine; (9) during inventory searches of impounded vehicles; and (10) during border and customs searches. *See State v. Milashoski*, 159 Wis. 2d 99, 111–12, 464 N.W.2d 21 (Ct. App. 1990). These exceptions are not inherently different in nature but instead each "presents a means by which the reasonableness of a given search and seizure may be assessed and described." *Id.* at 112. The State bears the burden of proving that the warrantless search falls within one of these narrowly drawn exceptions. *See id.* at 111.

¶ 12.  In *State v. Pires*, 55 Wis. 2d 597, 201 N.W.2d 153 (1972), the Wisconsin Supreme Court

497

approved the emergency rule as an exception to the warrant requirement, recognizing that the Fourth Amendment does not bar a government official from making a warrantless intrusion when the official reasonably believes that a person is in need of immediate aid or assistance. *See Boggess*, 115 Wis. 2d at 450. This emergency exception is based upon the idea that "the preservation of human life is paramount to the right of privacy protected by the fourth amendment." *Id.*

¶ 13. The test for a valid warrantless search under the emergency doctrine necessitates a two-step analysis. *See id.* First, the searching officer must be actually motivated by a perceived need to render aid or assistance. *See id.* Second, even if the requisite motivation exists, it must be found that, under the circumstances, a reasonable person would have thought an emergency existed. *See id.* at 450–51. In other words, the search was valid if the officers subjectively observed a need to provide immediate assistance and intended to do so when they entered the home and the facts, viewed objectively, sustain the conclusion that the officers had probable cause to believe that there was an emergency and immediate action was necessary for the protection of life or property. *See State v. Kraimer*, 99 Wis. 2d 306, 316–17, 298 N.W.2d 568 (1980). Both the subjective and objective components of this test must be met for the warrantless search to be valid. *See Boggess*, 115 Wis. 2d at 451.

¶ 14. When reviewing a trial court's order on a suppression motion, the findings of fact will be sustained unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2); *see also State v. Secrist*, 224 Wis. 2d 201, 207, 589 N.W.2d 387 (1999), *cert. denied*, 526 U.S. 1140 (U.S. May 24, 1999) (No. 98–9151). However, we will

"independently examine the circumstances of the case to determine whether the constitutional requirement of reasonableness is satisfied." *Kraimer*, 99 Wis. 2d at 319 (citations omitted). We will not disturb rulings on the admissibility of evidence absent a misuse of discretion. *See Milashoski*, 159 Wis. 2d at 110.

¶ 15. In the instant case, Rome argues that the objective facts do not support a reasonable belief that the two-year-old child was in immediate need of assistance, thereby warranting the entry into the house and closet. We disagree.

¶ 16. The objective component of the emergency rule requires that the officer "point to specific facts that, taken with the rational inferences from those facts, reasonably warranted the intrusion into an area in which a person has a reasonable expectation of privacy." *Boggess*, 115 Wis. 2d at 451. The necessity of reasonable grounds to believe that an emergency existed must be applied to the circumstances then confronting the officer, including his or her need for a prompt evaluation of possibly ambiguous information concerning potentially serious consequences. *See id.*

> [T]he objective test of the emergency rule is satisfied when, under the totality of the circumstances, a reasonable person would have believed that: (1) there was an immediate need to provide aid or assistance to a person due to actual or threatened physical injury; and (2) that immediate entry into an area in which a person has a reasonable expectation of privacy was necessary in order to provide that aid or assistance.

*Id.* at 452.

¶ 17. Grissom found a young woman crying and walking along the street in the middle of a cold Decem-

ber night, carrying a baby. The woman indicated that she and her intoxicated husband had had an argument about the children where he had yelled, threatened her and grabbed her hair. The argument was sufficiently serious to drive her out into the cold night without appropriate clothing for her or the baby. Although the woman insisted that she did not want police involvement and that her two-year-old child had been asleep and fine in the house before she left, she did acknowledge that Rome was drunk and probably did not even know that she had left the house. She admitted that she was concerned about the child's welfare because of Rome's intoxication and asked the officers to go to her house and check on the child.

¶ 18.   After arriving at the house, the officers received no response to the ringing of the doorbell and knocking on the door several times. In addition, the officers shouted Rome's name for over fifteen minutes but with no response. The Rome phone had been disconnected. After finding Rome asleep in one of the bedrooms, one officer noticed a flickering closet light. Thinking the child might be in the closet, he opened the door. In light of these circumstances, a reasonable person could believe that there was an immediate need to provide aid or assistance to the two-year-old child and that immediate entry into both the house and the closet was necessary in order to provide that aid or assistance. A situation need not necessarily involve a life-or-death circumstance in order to constitute an emergency within the emergency rule. *See id.* at 458. Rome was intoxicated and had been violent and threatening towards his wife while arguing about the children. A reasonable person could believe that the two-year-old child could be in danger while in Rome's care at that

time. We conclude that the objective test of the emergency rule has been met in this instance.

¶ 19.   Rome also argues that the officers' entry into the home was not subjectively motivated solely by a perceived need to render assistance to the two-year-old child. Rome asserts that pursuant to *Boggess*, 115 Wis. 2d at 443, under the emergency exception the officers' sole motivation must be to render immediate aid or assistance. Because one of the officers was motivated, in part, by his duty to investigate the alleged domestic abuse incident between Rome and his wife, Rome argues that the emergency exception does not apply. We decline to construe *Boggess* so strictly.

¶ 20.   The objective and subjective elements of the emergency rule exception to the Fourth Amendment are designed to prevent a pretextual entry into a home, but they do not specifically prohibit dual motivations. The officers' contemporaneous motivation to investigate an alleged domestic abuse incident does not divest them of their ability to engage in their immediate aid or assistance obligations. *Cf. Milashoski*, 159 Wis. 2d at 118 (authorities' concurrent suspicion of criminal activity does not deprive them of their ability to pursue their "render safe" activities). To hold otherwise would lead to absurd results. Under this theory, if a killer, holding a handgun, had murdered one person and a child was in the same room with the killer, government officials could not attempt to rescue the child because the child exigency would spill over into the murder investigation. The Fourth Amendment "permits officials to act reasonably in the face of actual or potential danger, not to ignore it." *Milashoski*, 159 Wis. 2d at 118.

501

¶ 21.   For example, in *Kraimer*, 99 Wis. 2d at 306, the Wisconsin Supreme Court approved a warrantless entry into a defendant's home under the emergency exception. The police had received three anonymous telephone calls in which the caller stated, in part, that he had shot and killed his wife, his four children were with him, and he was very upset. *See id.* at 308. After conducting some investigation, the police concluded that the anonymous caller was Kraimer. *See id.* at 308–09. The police then made a warrantless entry into Kraimer's home to investigate the status of Kraimer's wife and a possible burglary *and* to ascertain the welfare of his children. *See id.* at 319. The supreme court ruled the warrantless entry reasonable under the emergency exception because the officer's *main* purpose was not to secure evidence of a crime, but to determine the condition of the children and provide aid or assistance, if necessary. *See id.* at 320, 328–29.

¶ 22.   Similarly, in *Milashoski*, 159 Wis. 2d at 99, firefighters removed what appeared to be laboratory equipment and combustible chemicals from the basement of Milashoski's home following an explosion and a fire. *See id.* at 105. The equipment and chemicals were initially transferred to the fire station but were eventually shipped to the state crime laboratory where their contents were analyzed. *See id.* at 105–06. One of the liquids contained concentrations of two controlled substances. *See id.* at 106. Milashoski was then charged with manufacturing a controlled substance. *See id.* at 104. Because the firefighters did not have a warrant to search the basement, Milashoski moved to suppress the physical evidence against him. *See id.* at 106. The trial court denied the motion and Milashoski was convicted. *See id.* We affirmed the conviction, stating that "even if, arguendo, . . . fire officials were motivated by

safety concerns *and* a desire to conduct a criminal investigation, the safety concerns presented were sufficient in and of themselves to immunize the seizure, and any investigatory motives immaterial to such a result." *Id.* at 113. We were not convinced that the firefighters' concurrent suspicion of criminal activity deprived them of their ability to pursue their "render safe" activities. *See id.* at 118. Although the equipment and chemicals were suspected as evidence of criminal activity, they were also independently believed to be volatile and harmful to health. *See id.* We concluded that even if the fire officials had criminal investigation on their minds, this did not neutralize the genuineness of their "render safe" concerns. *See id.*

¶ 23. Likewise, we are not persuaded here that the officers' concurrent suspicion of a domestic abuse incident robbed them of their ability to provide aid or assistance. Even if the officers had the investigation of an alleged domestic abuse incident on their minds, this would not have neutralized the genuineness of their aid and assistance concerns regarding the two-year-old child. The safety concerns regarding the child were sufficient in and of themselves to immunize the seizure; any other investigatory motives were immaterial. Other jurisdictions have also held that so long as the search is actually and primarily motivated by a perceived need to render immediate aid or assistance, the search is valid. *See People v. Mitchell*, 347 N.E.2d 607 (N.Y. 1976); *People v. Duncan*, 720 P.2d 2 (Cal. 1986). The material question is whether the immediate need to provide aid or assistance was the officers' primary motivator. Here, the officers' need to provide aid or assistance was paramount to the perceived need to investigate an alleged domestic abuse incident.

.503

¶ 24. In sum, both the objective and subjective elements of the emergency rule exception to the Fourth Amendment search warrant requirement have been met.

## CONCLUSION

¶ 25. The police entry into Rome's house and closet was justified by emergency circumstances because the officers' primary purpose was to provide aid or assistance to the two-year-old child. The trial court's decision to deny Rome's suppression motion was correct. We therefore affirm the judgment of conviction.

*By the Court.*—Judgment affirmed.