COURT OF APPEALS
DECISION
DATED AND FILED

July 27, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP86-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2021CT90**

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

ROGER JAMES GOLLON,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Portage County: THOMAS B. EAGON, Judge. *Affirmed*.

¶1    BLANCHARD, P.J.[1] Roger Gollon appeals a judgment of conviction for operating a motor vehicle while intoxicated as a second offense, which was entered following his plea of no contest. Gollon argues that the circuit

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(c) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

court erred in denying his motion to suppress evidence. Police obtained the evidence after Gollon opened the front door of his residence and invited police to enter in response to the police knocking on the door and ringing the doorbell.

¶2　I conclude that all of the conduct of police officers that Gollon challenges was lawful, despite the absence of a warrant, and did not violate his Fourth Amendment protection to be secure in his house from unreasonable searches or seizures. This is because all of the conduct either falls within the scope of a proper exercise of the knock-and-talk investigative technique or within the emergency aid exception to the Fourth Amendment's warrant requirement. Accordingly, I affirm.

## BACKGROUND

¶3　Gollon was charged with drunk driving offenses. He moved to suppress evidence. At a suppression hearing the circuit court found to be credible the testimony of three police officers, the only witnesses called by the parties.[2]

*Sergeant Long Testimony*

¶4　City of Stevens Point Police Sergeant Michael Long testified that, at approximately 1:45 a.m. on a March night, Long was among the police officers and fire department employees who responded to a report of a vehicle crashing into a natural gas pipe or marker. An odor of gas was detected. Someone in the house next to the crash scene called in the event to authorities.

---

[2] The Hon. Thomas B. Eagon made the challenged ruling denying Gollon's motion to suppress. The case was subsequently transferred to the Hon. Michael D. Zell, but no ruling of Judge Zell is at issue in this appeal.

¶5     In what appeared to have been a single-car event, a car had run into not only the gas line equipment but also some cedar trees. The crash occurred "at least 10, 15 feet" off of a city street. There were no vehicles at the crash scene by the time first responders arrived. But left behind was the front bumper of a car. Still attached to the bumper was a license plate.

¶6     Police on the scene learned through a records check that Gollon was the registered owner of the car identified by the left-behind plate. Further, they learned that Gollon resided a few doors from the crash scene. Given the evidence at the scene, there appeared to be the possibility of physical injury to a person or persons.

¶7     Accompanied by Officer Josh McLouth, Long made the short trip from the crash scene to Gollon's house. When Long and McLouth arrived, Officer Alexander Beach was already at the front door of the house, knocking and ringing the doorbell.

¶8     Long spoke with Beach. Then Long walked around the front (or west-facing) side of the house and then to the north side of the house. There, he looked through a window into the attached garage. The garage was closed and Long walked over grass along the side of the garage to get to the garage window. Long testified that he did this because police did not know if there was "any kind of injury or possibly impaired driving or anything along those lines because [someone] crash[ed] a car and [left] a chunk of" the car behind. Through the garage window Long observed a car parked in the garage that "matched the color of the bumper that was left behind" at the crash scene.

¶9     Long returned to the front door of the house and, along with Beach and other officers, "continued to knock" on the door. Long told Beach that he had

seen inside the garage a car with a color that matched the color of the bumper at the crash scene. Beach told Long that Beach had observed, by looking in the window on the front door of the house, a person's feet on the floor of the kitchen area, sticking out from a doorway, although by this time the feet were not visible, at least to Long. Officers "[c]ontinued to knock, ring the bell," and "[e]ventually" Gollon "got up and answered the door."

¶10     Gollon "invited us inside the house," where Gollon discussed the crash with the officers. Gollon also told the officers "that he had been drinking." "[E]ventually," Gollon took police into the attached garage, where they observed a car missing its front bumper with "a chunk of cedar on it."[3] Before that time, Long had not physically entered the attached garage.

*Officer McLouth Testimony*

¶11     Officer Josh McLouth testified that after Long and McLouth arrived at Gollon's residence from the crash scene they spoke with Beach at the front door. Then Long went to the side of the house to look in the garage window while McLouth remained at the front door with Beach. Through the window of the front door, McLouth could "look[] down a hallway and there seemed to be … a window in the rear of the home" and the kitchen lights were on, although the rest of the house was dark. McLouth saw a person's stocking feet on the floor of the kitchen, heels on the ground, before Gollon came to the front door and opened it. McLouth did not know whose feet those were or anything about the health condition of the

---

[3] The circuit court made findings that Gollon "was cooperative" in his interactions with police after he met them at the front door and that his actions were "voluntary," because "there is no evidence of undue force, threats[,] or coercion." Gollon does not now challenge any aspect of those findings.

person. It seemed to McLouth that the feet disappeared from his sight when Gollon came to the door.

*Officer Beach Testimony*

¶12 Officer Alexander Beach testified that he did not go to the scene of the crash. But he knew that there had been a crash in which a driver had "possibly hit some sort of pipe or gas line" and left behind its front bumper with a license plate. Beach also knew that Gollon was the registered owner of the car and that Gollon's house was near the scene of the crash. Beach went to Gollon's house "to check for welfare and investigate the crash," because Gollon was the possible owner or driver of the vehicle in the crash. When Beach went to the house, he was not aware how many people might have been involved in the crash or whether the driver of the car that had left its bumper behind had a medical issue that might have caused the crash.

¶13 Beach walked up the driveway to reach the front porch area of Gollon's house. He knocked on the front door and rang the doorbell. "At first," and for about five minutes, no one in the house responded in any way. Through a window in the front door Beach could see that a light was on in the kitchen, located at the far side of the house. Beach never looked in any window of the house other than the front door window.

¶14 After Beach knocked and rang the doorbell for a time, Beach saw what appeared to be a person's feet. The feet did not move at first. They were "sticking out in the hallway from the kitchen, [with what] looked like black socks [so that it] looked like someone was laying on the floor." As far as Beach could

discern, the person was apparently motionless, lying on the person's back, and could have been either conscious or unconscious.[4]

¶15 After Beach observed the stocking feet on the floor by the kitchen, he "continued to shine the light and knock on the front door, ring the doorbell to try to get the person to wake up or respond." While Beach continued to knock, Long went to look in the garage window and a deputy sheriff "walked around to the side of the house to try to make contact with the person on the floor." Long might have told Beach before Gollon came to the door that Long had seen through the garage window a car that matched the description of the car in the crash, or instead Beach might have learned that from communications that came over his police radio.

¶16 "Eventually Mr. Gollon got up and came to the front door and opened the front door." The passage of time was "very short" between when Beach last observed the feet on the floor and when Gollon walked up to the door and opened it—one event followed the other "pretty much right away."[5]

_____

[4] The circuit court did not make specific findings regarding the timing of Sergeant Long's brief walk to the window on the north side of the attached garage relative to Officer Beach's first observation of stocking feet of a supine person. Long gave ambiguous and less than detailed testimony on this topic. However, in more detailed testimony, Beach conveyed that he observed the feet relatively early during his five minutes at the front door and that he informed Long of this shortly before Long went to the garage window. Based on this record, I reject as unsupported an argument Gollon makes based on the proposition that Long went to the garage window before Beach noticed the feet and told Long about seeing the feet.

[5] The circuit court found that "[e]ventually Mr. Gollon got up and came to the front door, opened the front door, and invited the officers into the house." These findings are amply supported by the record. I reject an argument Gollon makes to the effect that it was clear error for the court to find that Gollon stood up and came directly to the door, instead of, as Gollon now puts it, "retreat[ing] out of view."

¶17    After Gollon opened the door, Beach identified Gollon, the two talked, and Gollon invited the police into the house.  Once in the house, Gollon discussed with the officers the crash and his consumption of alcohol that night. Gollon also agreed to take the officers into the garage to look at the car parked there.

¶18    Turning from the evidence to the arguments of the parties, Gollon's suppression motion requested that the circuit court "suppress all evidence of the police contact with the defendant," which "was derived from the unlawful warrantless entry onto the curtilage of the defendant's home."  The prosecution's position was that all actions of the police were reasonable under the community caretaker police function under the circumstances that police were presented with.

¶19    In a written decision, the circuit court denied the motion to suppress. The court focused on the actions of Officer Beach and ruled that those actions did not violate the Fourth Amendment.

¶20    Gollon entered a plea of no contest to the operating while intoxicated charge and was sentenced.  He now appeals the suppression decision.

## DISCUSSION

¶21    The Fourth Amendment to the United States Constitution and article 1, section 11 of the Wisconsin Constitution protect against unreasonable searches and seizures.  *State v. Dearborn*, 2010 WI 84, ¶14, 327 Wis. 2d 252, 786 N.W.2d 97.  A warrantless search is presumptively unreasonable unless an exception to the warrant requirement applies.  *State v. Dalton*, 2018 WI 85, ¶38, 383 Wis. 2d 147, 914 N.W.2d 120.

¶22 More specific to the context here:

> "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" ***Welsh v. Wisconsin***, 466 U.S. 740, 748 (1984) (citing ***United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.***, 407 U.S. 297, 313 (1972)). "[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" ***Florida v. Jardines***, 569 U.S. 1, 6 (2013) (quoting ***Silverman v. United States***, 365 U.S. 505, 511 (1961)).
>
> Fourth Amendment protections also extend to the curtilage of one's home, the area "immediately surrounding and associated with the home." ***Oliver v. United States***, 466 U.S. 170, 180 (1984); ***State v. Martwick***, 2000 WI 5, ¶26, 231 Wis. 2d 801, 604 N.W.2d 552.

***State v. Wilson***, 2022 WI 77, ¶¶19-20, 404 Wis. 2d 623, 982 N.W.2d 67. Thus, the Fourth Amendment provides equal protection to the inside of a residence and its curtilage. *See* ***Jardines***, 569 U.S. at 6 (curtilage receives "protection as part of the home itself").

¶23 An appellate court reviewing an order granting or denying a motion to suppress evidence upholds the circuit court's findings of fact unless the findings are clearly erroneous, but the reviewing court conducts an independent, de novo analysis of the application of constitutional principles to the facts. ***State v. Robinson***, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463.

¶24 The dispositive issues in this appeal fall into two categories. As explained further below, the first involves arguments of the parties regarding the knock-and-talk investigative technique and the second involves the emergency aid exception to the Fourth Amendment's warrant requirement.

¶25    There is no dispute that both of the following areas were part of the curtilage of the residence:  the front door area of the house, which is a small, open porch area where Officer Beach knocked, rang, and looked in the front door window; and the north side of the house and attached garage, where Sergeant Long briefly walked to the garage window.  There is also no dispute that police did not have a warrant authorizing their entry onto the curtilage of Gollon's house.

¶26    I now explain why I conclude that the State has shown that the conduct of all officers, notably that of Officer Beach, was justified as falling within the proper nature and scope of an exercise of the knock-and-talk investigative technique.  In a separate section below I explain why I conclude that all remaining challenged conduct, primarily that of Sergeant Long but also the alleged light-shining by Beach, is covered by the emergency aid exception to the Fourth Amendment.

¶27    Before turning to the knock-and-talk issue, I note that Gollon confuses the issues through repeated references to cases in which the State seeks to rely on exigent circumstances for a warrantless entry to a residence.  *See **State v. Ferguson***, 2009 WI 50, ¶¶19-20, 317 Wis. 2d 586, 767 N.W.2d 187 (under exigency analysis, the State may rebut the presumption that warrantless entry to residence was unreasonable by proving that officers had probable cause to believe that an occupant committed a jailable offense and that exigent circumstances necessitated prompt action).  This is not one of those cases.

### I.   Knock-and-Talk Investigative Technique

### A.  Legal standards

¶28   As our supreme court has explained, the United States Supreme Court has approved an investigative technique, the "knock and talk," which "law enforcement may use in entering one's constitutionally-protected curtilage." *Wilson*, 404 Wis. 2d 623, ¶21 (citing *Jardines*, 569 U.S. 1).  The investigative technique "is not a search," but is "premised on the implicit license that a visitor, or neighbor, would have with regard to entering one's curtilage." *Id.*, ¶21.  Like any private citizen, such as a girl scout selling cookies or a neighbor stopping by to exchange information, police generally have an "implicit license" "'to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.'" *Id.*, ¶25 (quoting *Jardines*, 569 U.S. at 8).

¶29   As to the nature and scope of activity allowed before police conduct amounts to a Fourth Amendment seizure, this court has favorably summarized federal court case law as establishing "the following non[-]exhaustive list of relevant factors in determining whether" an impermissible "'constructive entry' to a residence has occurred during a 'knock and talk':  the time of day, the number of officers present, the show of authority[,] and officer persistence." *City of Sheboygan v. Cesar*, 2010 WI App 170, ¶17, 330 Wis. 2d 760, 796 N.W.2d 429. In *Cesar*, for example, we concluded that police were "not overly intrusive or coercive," and therefore there was no "constructive entry" to a residence, when, after 10:00 p.m., three uniformed officers:  went to the front and rear doors of a house; "rang the doorbell 'numerous times' and knocked 'numerous times' on the door and windows during a five- to ten-minute period"; took "turns looking in the

windows of the residence and were able to see an individual in the kitchen"; identified themselves as police officers and "'shouted'" that they wanted to speak with the man; had a "'back and forth'" conversation with the man after he came to a window that lasted approximately five minutes, during which the man in part said that he was not coming out of his house and the officers said the man would come out or police would apply for a search warrant. *Id.*, ¶¶3-9 & n.3, 13-19.

### B. Analysis

¶30    There is no dispute that here Officer Beach walked up the driveway to the front door as any visitor would ordinarily do, promptly knocked and rang, did not look in any windows except the one on the front door, and did not attempt to enter the house before he was invited to do so by Gollon after about five minutes of knocking and ringing.  There was no testimony that any officer knocked on any window of the house, shouted, or directed statements to any occupant about a potential search warrant.  As the circuit court summed it up, "Officer Beach knocked on the door for a reasonable period of time, approximately 5 minutes, and did not enter [the house] until invited by the defendant[,] who had apparently been lying on the kitchen floor in his stocking feet."

¶31    Gollon acknowledges that it was not a search or seizure under the Fourth Amendment for Beach to look through the front door window into the house, given that Beach was lawfully standing at the door for a knock and talk. *See State v. Edgeberg*, 188 Wis. 2d 339, 347, 524 N.W.2d 911 (Ct. App. 1994) ("[I]f police use normal means of access to and from the house for some legitimate purpose, it is not a [F]ourth [A]mendment search for police to see from that vantage point something in the dwelling."); *State v. Phillips*, 2009 WI App 179,

11

¶11 n.6, 322 Wis. 2d 576, 778 N.W.2d 157 (favorably quoting the following definition of a knock and talk: "'a powerful investigative technique'" in which "'police go to people's residences, with or without probable cause, and knock on the door *to obtain plain views of the interior of the house*, to question the residents, to seek consent to search, and/or to arrest without a warrant, often based on what they discover during the 'knock and talk'" (emphasis added) (quoted source omitted)).

¶32 Gollon makes an argument based on ambiguous testimony Officer Beach gave about his use of a "light" while he was at the front door. As summarized above, Beach testified that, after he observed what looked like the feet of a supine person, he "continued to shine the light and knock on the front door, ring the doorbell to try to get the person to wake up or respond." Neither side at the evidentiary hearing pursued with Beach, or any other witness, Beach's reference to Beach shining a light. Beach did not indicate in his testimony where or how he shined a light, however big or small, or for what specific purpose or purposes—such as to try to gain attention from anyone looking out a window or instead to illuminate parts of the interior of the house. The circuit court did not make factual findings on these issues.

¶33 I assume without deciding that, as Gollon argues, Beach's testimony should be interpreted to mean that Beach shined a flashlight through the window of the front door to enhance his viewing of the hallway of the house leading to the kitchen. I also assume without deciding that, as Gollon also argues, Beach's use of the flashlight in this manner, under all of the pertinent circumstances, would have exceeded the proper scope of a knock and talk. But even with those assumptions, the clear implication of all of the testimony given at the evidentiary hearing is that Beach first observed the feet on the floor with the assistance of one

12

or more lights that were on in the house, which were shining light in the kitchen area. Both Beach and McLouth gave testimony to this effect. If, after this, Beach used an ordinary police flashlight to further inspect the area around the stocking feet, such conduct would clearly be covered under the emergency aid exception, which I address in the next subsection of this opinion.

¶34 Separately, Gollon suggests that, as he puts it, "arriving at a house at 2:00 a.m." and "banging loudly on the door for a long time" was in itself police conduct that falls outside the permitted nature and scope of the investigative technique.

¶35 The lateness of the hour counts toward a potential constructive entry. *See City of Sheboygan*, 330 Wis. 2d 760, ¶17. It is also true that Officer Beach was accompanied by several other officers, some of whom also knocked on the front door, which is another factor to consider. *See id.* However, the totality of the circumstances here are less intrusive than those in *City of Sheboygan*. Further, there is no suggestion that the police here intentionally picked an inopportune time to knock and ring at Gollon's door—here, as in *City of Sheboygan*, the timing was driven by events outside the control of police. *See id.*, ¶¶3-4. Further, there is no evidence that officers went to the rear of the house or swarmed all around the house. There was only Long's testimony about briefly looking in the garage window and Beach's reference in his testimony, not probed by either side at the evidentiary hearing, that a deputy sheriff "walked around to the side of the house to try to make contact with the person on the floor." These were apparently brief and not especially intrusive or disruptive actions.

¶36 Further, Gollon now exaggerates the evidence given at the evidentiary hearing regarding the nature of the attempts by Beach and other

13

officers to invite a response from an occupant of the house. The testimony was that Officer Beach, sometimes accompanied by other officers, persistently rang the bell and "knocked" on the door. Contrary to the dramatic language in Gollon's appellate briefing, no variation on "banging loudly" appears in the hearing transcript in referring to how officers knocked on the door, and there is no evidence that they knocked on any window. Presumably, in some cases police purporting to act within the scope of the implied license could strike a door with such force or using tools in such a manner that, together with other relevant factors, the implicit license is exceeded. *See **Jardines***, 569 U.S. at 8 (the proper scope of a knock and talk is determined by the "implied license" that is granted to "solicitors, hawkers[,] and peddlers of all kinds") (citation and quotation marks omitted); ***City of Sheboygan***, 330 Wis. 2d 760, ¶17. But Gollon fails to cite record evidence that what the police did at the door in this case even approached the line into a constructive entry.

¶37 Gollon suggests that five minutes of knocking and ringing under these circumstances was not, in the words of ***Jardines***, "wait[ing] briefly to be received, and then (absent invitation to linger longer) leav[ing]." *See **Jardines***, 569 U.S. at 8; *cf*. ***United States v. Carloss***, 818 F.3d 988, 998 (10th Cir. 2016) ("We decline to place a specific time limit on how long a person can knock before exceeding the scope of th[e] implied license."). Gollon fails to support an argument that, under the totality of the circumstances here, the knocking and ringing was insufficiently "brief." Life experience suggests that five minutes may be on the long side for what a residential occupant might consider to be an ordinary attempt by a visitor to gain attention from an occupant. But here, given the late hour that was driven by events outside the control of the police, a visitor would reasonably expect any occupants of Gollon's house to require some minutes

to become aware of and then decide how to respond to knocking and ringing at the front door. Further, even putting aside safety issues addressed as part of the emergency aid exception below, the police could hope that the supine person might at any moment get up, possibly awakening or rousing him or herself. And, the time period here was likely shorter than, and certainly not longer than, that in *City of Sheboygan*. In sum, the State has shown that the scope and nature of the knock and talk here was a reasonable use of the investigative technique under the relevant circumstances.

¶38 Gollon argues that the conduct of the officers here resembles negative scenarios discussed by the Court in *Jardines*, which involved a visitor to a house "exploring the front path with a metal detector or marching his bloodhound into the garden before saying hello and asking permission." *See Jardines*, 569 U.S. at 9. The comparison is inapt and Gollon does not develop it as an argument that properly addresses the actual evidence about the conduct of Beach, Long, McLouth, and the deputy.

¶39 Gollon also argues that "[t]here was no testimony that Officer Beach would have continued knocking had Sergeant Long not reported that he observed the vehicle in the garage." But the findings of the circuit court, which are well supported by the evidence given at the hearing, strongly imply that Beach would have continued to knock and ring in the ongoing efforts of the officers to get a response from the supine person or anyone else who might be in the house, regardless of what Long reported having seen in the garage. In addition, it would not matter either way since the emergency aid exception applies to Long's conduct, as I now explain.

15

## II.      Emergency Aid Exception

¶40      I conclude that the emergency aid exception excuses the failure of the officers to obtain a warrant for any activity that might not have fallen within their proper exercise of the knock-and-talk technique.

### A. Additional background

¶41      In opposing Gollon's suppression motion in the circuit court, the prosecution in September 2021 relied heavily on the community caretaker exception to the Fourth Amendment's warrant requirement.  This missed the target.  The previous May, the U.S. Supreme Court ruled that the community caretaker exception does not authorize the warrantless search of a residence, *see Caniglia v. Strom*, 593 U.S. ___, 141 S. Ct. 1596 (2021), and therefore the challenged police conduct here involving entry onto the curtilage could not be justified under that exception.  The Court explained in *Caniglia* that the community caretaker exception is limited to the context of automobile searches and cannot justify a warrantless search of a residence.  *Caniglia*, 141 S. Ct. at 1598, 1600.[6]

¶42      The circuit court here recognized this problem by the time of its decision in June 2022 denying Gollon's suppression motion and further recognized that the prosecution was attempting to relabel its argument to one based on the emergency aid exception.  *See id.* at 1603-04 (Kavanaugh, J.,

---

[6] The prosecution here, in its filing in the circuit court opposing suppression, acknowledged the existence of *Caniglia v. Strom*, 593 U.S. ___, 141 S. Ct. 1596 (2021), but inaccurately stated that the emergency aid exception "is the same as the community caretaker exception."  To the extent that the State on appeal may intend to rely on this same inaccurate proposition through references to the community caretaker exception, I ignore those arguments.

16

concurring) (four justices note that a warrant to search a residence is not required when there is a need to assist a person who is injured). However, the circuit court rested its decision entirely on its determination that Officer Beach executed a proper knock and talk and the court did not address the emergency aid exception.[7]

¶43 Now, on appeal, the State relies primarily on the emergency aid exception. As discussed below, Gollon argues that the emergency aid exception does not apply to the facts here. But Gollon does not argue that the State has in any manner waived or forfeited this argument.

¶44 With that background, I now quote a summary of the law governing the emergency aid exception and apply it to aspects of the challenged police conduct to the extent that they might not have been permitted as a proper knock and talk.

## B. Legal standard

¶45 This court has summarized the pertinent legal standards as follows:

---

[7] Gollon apparently intends to suggest that reversal is required because the circuit court's written decision did not explicitly address his allegation that Sergeant Long conducted "an illegal search of the curtilage of his home." Seemingly implicit in the circuit court's decision was a determination that it did not matter whether Sergeant Long had a sufficient justification under the Fourth Amendment to walk to the north side of the garage and look into the garage through a window, given the circuit court's ruling that Officer Beach conducted a proper knock and talk. If this is what the circuit court meant to convey, it might have been a proper application of the law. But I assume without deciding that at least some of the police conduct at Gollon's house that he now challenges requires separate justification under the Fourth Amendment and address it in this subsection. Gollon does not support his argument that reversal is required simply because the circuit court did not explicitly address the significance, or lack of significance, of Sergeant Long's conduct. *See State v. Baudhuin*, 141 Wis. 2d 642, 648, 416 N.W.2d 60 (1987) (a circuit court decision on a legal issue may be sustained if it is correct, even if the court did not use the same reasoning as the appellate court).

17

One exception to the warrant requirement recognized by our supreme court concerns emergency aid. [*State v. Rome*, 2000 WI App 243, ¶12, 239 Wis. 2d 491, 620 N.W.2d 225] (citing *State v. Pires*, 55 Wis. 2d 597, 201 N.W.2d 153 (1972)). This exception states that the Fourth Amendment does not bar a government official from making a warrantless intrusion "when the official reasonably believes that a person is in need of immediate aid or assistance." *Id.* (citing [*State v. Boggess*, 115 Wis. 2d 443, 450, 340 N.W.2d 516 (1983)]); *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("[L]aw enforcement officers may enter a residence without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). This exception is based upon the idea that "the preservation of human life is paramount to the right of privacy protected by the [F]ourth [A]mendment." *Rome*, 239 Wis. 2d 491, ¶12.

Under this exception, "whether a warrantless home entry is justified based on the need to render assistance or prevent harm is judged by an objective test." *State v. Larsen*, 2007 WI App 147, ¶18, 302 Wis. 2d 718, 736 N.W.2d 211. As a result, officers must have "an objectively reasonable basis for believing that a person within [the residence] is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam) (citations omitted).

Wisconsin courts apply a two-part test in determining whether the emergency aid exception applies:

> [U]nder the totality of circumstances, a reasonable person would have believed that: (1) there was an immediate need to provide aid or assistance to a person due to actual or threatened physical injury; and (2) that immediate entry into an area in which a person has a reasonable expectation of privacy was necessary in order to provide that aid or assistance.

*Rome*, 239 Wis. 2d 491, ¶16 (quoting *Boggess*, 115 Wis. 2d at 452). The United States Supreme Court has further explained that "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Fisher*, 558 U.S. at 49 (citations omitted).

18

*State v. Ware*, 2021 WI App 83, ¶¶20-22, 400 Wis. 2d 118, 968 N.W.2d 752 (*Ware* reflects third, sixth, and seventh alterations).

### C. Analysis

¶46 Taking into account the totality of the circumstances, I conclude the following. When Officer Beach observed the feet of a supine person on the floor who appeared to be motionless and not initially responsive to the knocking and ringing, a reasonable person in the position of the officers would have believed that there was an immediate need to provide aid or assistance to the supine person due to actual or threatened physical injury and that immediate entry into the house was necessary in order to provide that aid or assistance.[8]

¶47 At least one car had crashed into multiple solid objects, well away from the nearest street. This had generated sufficient forces to completely strip off the front bumper of one car. From all appearances, the witness had called in the crash as soon as it occurred and the driver of the front-bumperless car had very recently left the scene without reporting it to law enforcement. There was strong reason to believe that one or more persons involved in the crash were in Gollon's house, given its proximity to the crash scene and the fact that he was the registered owner of the car. With all that as context, someone lay supine on the floor in the kitchen area of Gollon's house at approximately 2:00 a.m. and this person did not appear to stir, despite knocking and ringing.

---

[8] I exclude from my analysis regarding the applicability of the emergency aid exception the information that Sergeant Long gained from looking into the garage: that there was a car in the garage with the same color as the left-behind bumper. Even without Long's garage information, the other facts that Officer Beach had, including by looking through the front door window, were sufficient to trigger the emergency aid exception.

¶48     From all these facts, the inferences were strong that the supine person had a medical condition or injury and was not simply taking advantage of his or her right not to respond to the knocking and ringing. Instead, for the reasons just noted, police had compelling reasons to worry that this person had fallen or collapsed due to a medical condition or injury associated with the crash—whether it was a condition or injury that contributed to the crash or was instead caused by the crash.

¶49     As events proceeded, fortunately, the supine person did not appear to be suffering from a significant physical injury after he finally got to his feet, walked to the front door, and revealed himself to be the registered owner of the car. But that does not take away from the objectively reasonable, high level of concern about a potential medical emergency that a police officer in the position of Officer Beach would have had before the person got up and walked to the door.

¶50     For these reasons, the police could have lawfully entered the house without consent or a warrant to provide aid or assistance to the supine person. The officers here were tasked with making difficult decisions under pressure and in a fluid situation. They did not take the step of entering the house before Gollon got up and came to the door. But that does not diminish their lawful authority to do so. And, given their lawful authority to enter the house, it could hardly have violated the Fourth Amendment for Beach to take the far less intrusive step of shining a flashlight into the hallway (assuming that Beach did this), for Long to briefly enter onto the curtilage to the window of the attached garage, or for the deputy to make some attempt, also on the curtilage, to make contact with the supine person.

¶51 Gollon points out that "there was no testimony that law enforcement knew of any injury or medical condition associated with the crash." However, I have explained why the circumstances signaled a potentially serious actual or threatened physical injury. In effect, Gollon demands in this case what the U.S. Supreme Court has explained is not needed in this context: "ironclad proof of 'a likely serious, life-threatening' injury." *See Fisher*, 558 U.S. at 49 (quoted source omitted).

¶52 Gollon argues that Sergeant Long's looking into the garage window could not possibly have been aimed at addressing a potential injury or medical condition. This ignores the objective standard; what matters is not the subjective intentions of Long in the moment that he went to the window, but instead the permissibility of his conduct when evaluated under the emergency aid exception. *See Larsen*, 302 Wis. 2d 718, ¶18 ("whether a warrantless home entry is justified based on the need to render assistance or prevent harm is judged by an objective test"). Because the officers here were presented with circumstances that justified actual entry to the house based on the emergency aid exception, any of them would have been objectively justified in looking at or through any window if that might provide information that could reasonably further the goal of safely rendering aid or assistance to the motionless, supine person. Apparently, the first window of the house that one finds when walking from the front (west) side of the house to its north side was the garage window that Long went to. Long could have continued around the house, looking in each window to assess the safest and most effective potential entry point, on the reasonable assumption that the front door was locked. He did not do this, but he lawfully could have.

## CONCLUSION

¶53　For these reasons, I affirm denial of the motion to suppress.

*By the Court*.—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.