COURT OF APPEALS
DECISION
DATED AND FILED

March 11, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP730-CR**

Cir. Ct. No. **2020CM83**

STATE OF WISCONSIN

**IN COURT OF APPEALS
DISTRICT III**

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

RYAN D. WILKIE,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Eau Claire County: SARAH M HARLESS, Judge. *Affirmed*.

¶1 HRUZ, J.[1] Ryan D. Wilkie appeals a judgment convicting him, following a jury trial, of obstructing an officer and disorderly conduct. Wilkie challenges his conviction for the obstruction offense on two bases: (1) the circuit court erred by denying Wilkie's motions to dismiss the complaint because law

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

enforcement had no lawful authority to enter his home under the Fourth Amendment; and (2) the evidence at trial was insufficient to support the jury's finding that he obstructed an officer. For the reasons that follow, we reject Wilkie's arguments and affirm.

## BACKGROUND

¶2      The relevant facts in this case appear to be largely undisputed on appeal. On December 11, 2019, law enforcement responded to Wilkie's home in Eau Claire, Wisconsin, after his neighbor in the adjoining duplex unit called 911. The following information comes from the criminal complaint, testimony at trial, the audio recording of the 911 call, and law enforcement's video recording of the encounter with Wilkie.[2] According to the complaint, the neighbor "reported that a male and female were screaming at each other inside the residence. The [neighbor] further reported hearing loud banging noises, which he believed to be from a physical altercation between the male and female subjects, and heard the female repeatedly screaming, 'Stop' and 'no.'"

¶3      Officer Dominic Meincke, with the City of Eau Claire Police Department, was one of the officers who responded to Wilkie's home.[3] According to Meincke's testimony, he approached Wilkie's front door with another officer, and both officers were wearing their uniforms. Meincke explained that, based on the 911 call, he "was concerned that there had possibly been some sort of altercation

---

[2] Both recordings were played for the jury during the trial. The video recording of the encounter is taken from the vantage point of the police vehicle on the street, but the officers were wearing microphones and could be heard on the video.

[3] City of Eau Claire Police Department Officers Mark Vang and Jacob Olson also responded, but they did not testify at Wilkie's trial.

2

inside and somebody may be injured or in need of medical attention." Wilkie came to the front door and stepped just outside onto a concrete slab in front of the door, and the officers informed him of the reason for their visit.[4]

¶4     When the officers asked to go inside the home to speak with Wilkie's family, Wilkie refused. According to the recording, Wilkie first stated that "she"—meaning his fifteen-year-old daughter, Sabrina[5]—"can [come] out, [but] you're not going in my house." He then appeared to change his mind and refused the officers' request to speak with "[e]verybody" in the home. The officers explained to Wilkie that they needed to speak with "everybody else inside" the house "cause we gotta figure out what's going on" "[f]or the safety of who can be hurt in there." Wilkie told the officers that "[t]here's nobody hurt in there," but the officers stated, "How can we know that[?]" After Wilkie responded that "yelling and screaming doesn't mean that there's somebody hurt in there," the officers explained what the neighbor heard based on the 911 call.

¶5     Eventually Wilkie said, "I'm done talking to you," and became uncooperative. The officers then stated, "Okay, here's the deal. We are going to go in and make sure people are okay." Wilkie responded, "Ya know what I'm not making any deals, do not go into my house." The officers informed Wilkie that "we don't need your permission to go in." Wilkie yelled, "You're not going in my home!" After continuing to prevent the officers from entering the residence by

---

[4] According to the recording, Wilkie asked Meincke right away to "watch the back door" because he did not want his daughter "bailing out the back door." After Wilkie asked if there was "somebody back there," Meincke replied, "Yeah, yep," and confirmed that there was "definitely" someone from law enforcement back there.

[5] We refer to Wilkie's daughter using a pseudonym in order to protect her privacy, given that she was a minor at the time these events occurred.

3

physically blocking the door, Wilkie was arrested. When officers attempted to handcuff Wilkie, he resisted arrest. Wilkie then began yelling profanity at the police, telling them to "[f]uck off," calling them "a bunch a fucking pigs," and suggesting that the officers' actions might hurt Sabrina and that if "[y]ou hurt my kid or she dies I swear to Christ I will come back from hell to fuck you guys" and that "I will fucking shoot you all."[6]

¶6 According to Wilkie's trial testimony, he was engaged in a verbal argument that evening with Sabrina. He testified that Sabrina "blew up" and "started screaming, yelling, [and] throwing things" when he grounded her and took her phone. Wilkie explained that Sabrina "ran into her room [and] slammed the door, so [he] took the door off" the hinges. At some point that evening, Sabrina also attempted to leave the home in extremely cold weather, and Wilkie prevented her from leaving. Wilkie agreed at trial that he was "absolutely not" allowing the officers into his home.

¶7 The State charged Wilkie in a criminal complaint with obstructing an officer, contrary to WIS. STAT. § 946.41(1), and disorderly conduct, contrary to WIS. STAT. § 947.01(1). Wilkie moved to dismiss the charge of obstructing an officer on two bases. First, he moved to dismiss the charge because the complaint did not contain probable cause to establish that Wilkie obstructed an officer. He argued that "[t]he officers lacked a warrant, an exigency, and status as community caretakers when they attempted to enter Mr. Wilkie's home"; therefore, he "could not have

---

[6] We note that law enforcement never actually entered Wilkie's home. Once Wilkie was arrested, the other occupants of the home came to the door, and officers were able to confirm that no one was injured.

committed the crime of obstructing an officer because the officers lacked lawful authority both to enter his home and to detain him for refusing their entry."

¶8 Second, Wilkie asked the circuit court to hold a *Franks*/*Mann* hearing. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *State v. Mann*, 123 Wis. 2d 375, 385-86, 367 N.W.2d 209 (1985). Wilkie argued that "the State recklessly omitted from the complaint certain facts that, had they been included, would have resulted in a lack of probable cause" that he committed the obstruction offense. Wilkie cited the video recording of the encounter as proof that the officers were not acting with lawful authority when they tried to enter his home and detain him.

¶9 The circuit court held a nonevidentiary hearing on both of Wilkie's motions. As to the motion to dismiss for lack of probable cause, the court concluded that the officers' "community caretaker function" was "validly executed in this case." The court also rejected Wilkie's *Franks*/*Mann* motion, stating that "[e]ven with that additional information [from the recording], which simply goes toward perhaps subjective beliefs of the officer," that information would not "change the analysis regarding the community caretaker function."

¶10 Months later, Wilkie moved the circuit court for reconsideration pursuant to the United States Supreme Court's decision in *Caniglia v. Strom*, 593 U.S. 194 (2021). In that motion, Wilkie argued that *Caniglia* abrogated Wisconsin's case law on whether the community caretaker exception applied to warrantless searches of homes. The court held another nonevidentiary hearing on Wilkie's motion to reconsider. At that hearing, Wilkie insisted that no exigent circumstances existed that would have granted the officers lawful authority to enter his home. Nevertheless, the court denied Wilkie's motion, distinguishing *Caniglia*

from the facts of this case and stating that "this is the type of situation that exigent circumstances does cover."

¶11    Wilkie's case proceeded to a one-day jury trial. At the trial, the neighbor and Officer Meincke testified for the State. Wilkie testified in his own defense, along with Sabrina and Wilkie's fiancée. The jury found Wilkie guilty of both charges—obstructing an officer and disorderly conduct—and the circuit court entered judgment accordingly. Wilkie now appeals, challenging only his obstruction conviction.

## DISCUSSION

### I. Motions to Dismiss

¶12    Wilkie first renews his argument that the circuit court erred by denying his motions to dismiss because "police had no lawful authority to enter his home under the Fourth Amendment," as they were attempting to do when he obstructed them. (Formatting altered.) The State disagrees, asserting that although "[t]he community caretaker doctrine cannot be used as a standalone justification to ent[er] a home without a warrant," *see **Caniglia***, 593 U.S. at 199, "[t]he [e]mergency [a]id [e]xception to the warrant requirement permits a government official [to enter a] home 'when the official reasonably believes that a person is in need of immediate aid or assistance,'" *see **State v. Ware***, 2021 WI App 83, ¶20, 400 Wis. 2d 118, 968 N.W.2d 752. The State contends that the officers in this case were acting with this lawful authority when they sought to enter Wilkie's home, and, accordingly, the complaint provided probable cause that Wilkie obstructed an officer.

6

¶13    The sufficiency of a criminal complaint is a matter of law that we review de novo. *State v. Adams*, 152 Wis. 2d 68, 74, 447 N.W.2d 90 (Ct. App. 1989). "A complaint, to be sufficient, must set forth facts within its four corners that, together with reasonable inferences from those facts, would allow a reasonable person to conclude that a crime had been committed and that the defendant was probably the person who committed it." *State v. Chagnon*, 2015 WI App 66, ¶7, 364 Wis. 2d 719, 870 N.W.2d 27; *see also State v. Reed*, 2005 WI 53, ¶12, 280 Wis. 2d 68, 695 N.W.2d 315 (noting the questions a sufficient complaint must answer). "The test of a complaint is of 'minimal adequacy, not in a hypertechnical but in a common sense evaluation, in setting forth the essential facts establishing probable cause.'" *State v. Smaxwell*, 2000 WI App 112, ¶5, 235 Wis. 2d 230, 612 N.W.2d 756 (citation omitted).

¶14    Wisconsin's obstructing an officer statute requires proof of four elements. *See* WIS. STAT. § 946.41(1);[7] WIS JI—CRIMINAL 1766 (2024).[8] First, the defendant must obstruct an officer, meaning that the defendant's conduct "prevents or makes more difficult the performance of the officer's duties." WIS JI—CRIMINAL 1766. Second, the officer must have been "doing an act in an official capacity," meaning that he or she was "perform[ing] duties that [he or she was] employed to perform." *Id.* Third, the officer must have been acting with "lawful authority." *Id.* "Lawful authority describes whether the officer's actions are conducted in accordance with the law." *State v. Ferguson*, 2009 WI 50, ¶¶14-16, 317 Wis. 2d 586, 767 N.W.2d 187. Fourth, the defendant must have known that the

---

[7] WISCONSIN STAT. § 946.41(1), pursuant to exceptions not relevant here, provides that "whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor."

[8] All references to WIS JI—CRIMINAL 1766 are to the 2024 version.

officer was "acting in an official capacity and with lawful authority" and known that his or her "conduct would obstruct the officer." WIS JI—CRIMINAL 1766.

¶15 Wilkie argues that "[t]he central question here is whether the officers had 'lawful authority' to enter Wilkie's home." "Thus," he argues, "in reviewing the sufficiency of the complaint, this court should decide whether [the attempted] police entry into Wilkie's home complied with the Fourth Amendment." The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "[W]arrantless searches of homes are presumptively unreasonable." *Ware*, 400 Wis. 2d 118, ¶19 (citation omitted). It is undisputed that the officers in this case did not have a warrant to enter and search Wilkie's home. The warrant requirement is, however, "'subject to a few carefully delineated exceptions' that are 'jealously and carefully drawn.'" *State v. Rome*, 2000 WI App 243, ¶10, 239 Wis. 2d 491, 620 N.W.2d 225 (citation omitted). It is the State's burden to prove that one of the exceptions applies to a warrantless search. *Id.*, ¶11.

¶16 As an initial matter, we must address Wilkie's argument that the community caretaker exception does not apply to warrantless entries into homes. As noted above, the circuit court denied Wilkie's first motion to dismiss on the basis that the community caretaker exception authorized the officers to enter Wilkie's home under the totality of the circumstances—meaning that the officers had "lawful authority" under that exception. A little over nine months later, the United States Supreme Court reached its decision in *Caniglia*, concluding that the community caretaker exception did not apply to warrantless searches and seizures in the home. *Caniglia*, 593 U.S. at 198-99. Both parties appear to agree that, after *Caniglia*, the community caretaker exception is limited to cases involving searches and seizures

of automobiles and cannot be used to justify warrantless intrusions into a home. *See **Ware***, 400 Wis. 2d 118, ¶14 & n.4.

¶17 Instead of the community caretaker exception, the State argues on appeal that warrantless entry into Wilkie's home was legally authorized by the emergency aid exception.[9] The emergency aid exception "recognize[s] that the Fourth Amendment does not bar a government official from making a warrantless intrusion when the official reasonably believes that a person is in need of immediate aid or assistance." ***Rome***, 239 Wis. 2d 491, ¶12. "This exception is based upon the idea that 'the preservation of human life is paramount to the right of privacy protected by the [F]ourth [A]mendment.'" ***Ware***, 400 Wis. 2d 118, ¶20 (quoting ***Rome***, 239 Wis. 2d 491, ¶12). The emergency aid exception "demands that the

---

[9] In response to the State's argument that the emergency aid exception would have justified the officers' warrantless entry into Wilkie's home, Wilkie argues that "[t]he [S]tate never argued the emergency aid exception in the circuit court" and that "the circuit court never considered[] the emergency aid exception when finding that 'exigent circumstances' existed to justify the warrantless entry." Although Wilkie admits that "nothing prevents the [S]tate from making the emergency aid argument for the first time on appeal," he cites ***Townsend v. Massey***, 2011 WI App 160, ¶¶23-24, 338 Wis. 2d 114, 808 N.W.2d 155, for the proposition that we have the discretion not to address arguments raised for the first time on appeal. According to Wilkie, "[b]ecause Wilkie had no opportunity to refute the emergency aid exception argument in the circuit court, this court should not consider it on appeal."

We refuse Wilkie's request that we not consider the State's argument on appeal. Wilkie appears to misunderstand how the forfeiture doctrine works. This court will generally not consider issues raised by *an appellant* for the first time on appeal, so that we do not "blindside [circuit] courts with reversals based on theories which did not originate in their forum." ***Schonscheck v. Paccar, Inc.***, 2003 WI App 79, ¶¶10, 11, 261 Wis. 2d 769, 661 N.W.2d 476 (citation omitted). In contrast, as a matter of judicial efficiency, *a respondent* may advance for the first time on appeal any argument that would *sustain* the circuit court's ruling. ***State v. Holt***, 128 Wis. 2d 110, 124-25, 382 N.W.2d 679 (Ct. App. 1985), *superseded by statute on other grounds*, WIS. STAT. § 940.225(7). Furthermore, Wilkie does not allege that he suffered prejudice by having to address the emergency aid exception for the first time on appeal, and it is clear that exception was the one at issue under the facts alleged and even under the circuit court's "exigent circumstances" analysis. The State also argues that we have "reaffirmed that the emergency aid exception applies even if the entry was originally examined under the community caretaker doctrine." *See **State v. Ware***, 2021 WI App 83, ¶2, 400 Wis. 2d 118, 968 N.W.2d 752. Accordingly, we see no reason to disregard the State's emergency aid exception argument.

government official's actions be motivated solely by a perceived need to render immediate aid or assistance, not by a need or desire to obtain evidence for a possible prosecution." **State v. Boggess**, 115 Wis. 2d 443, 450, 340 N.W.2d 516 (1983). While the parties in this case both, at times, focus on the officers' subjective beliefs, "whether a warrantless home entry is justified based on the need to render assistance or prevent harm is judged by an objective test." *See* **Ware**, 400 Wis. 2d 118, ¶21 (citation omitted). "As a result, officers must have 'an objectively reasonable basis for believing that a person within [the residence] is in need of immediate aid.'" **Id.** (alteration in original; citation omitted).

¶18    We apply a two-part test to determine whether the emergency aid exception applies:

> [U]nder the totality of circumstances, a reasonable person would have believed that: (1) there was an immediate need to provide aid or assistance to a person due to actual or threatened physical injury; and (2) that immediate entry into an area in which a person has a reasonable expectation of privacy was necessary in order to provide that aid or assistance.

*Id.*, ¶22 (alteration in original; citation omitted). "The United States Supreme Court has further explained that '[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception.'" **Id.** (alteration in original; citation omitted).

¶19    We conclude, based on the four corners of the criminal complaint in this case, that the officers had lawful authority to enter Wilkie's home on the basis

of the emergency aid exception to the Fourth Amendment's warrant requirement.[10]

According to the criminal complaint,

---

[10] We pause here to note that, in his reply brief, Wilkie also argues that the complaint failed to establish probable cause that Wilkie knew or believed he was obstructing an officer and knew or believed the officers were acting with lawful authority. He then faults the State for "mak[ing] no effort to refute Wilkie's claim that [the State] omitted critical information from the complaint that would have negated probable cause." Wilkie further argues that "[l]ike the circuit court, the [S]tate's response addresses only information in the complaint and ignores the recorded statements of the 911 caller, the police, and Wilkie." Accordingly, Wilkie asserts that we should accept the State's "failure to respond to Wilkie's claims as a confession of error."

Based on our review of Wilkie's brief-in-chief, he appears to separate his arguments into the State's failure to establish probable cause showing the officers' "lawful authority" in the criminal complaint and the State's failure to establish, beyond a reasonable doubt at trial, that Wilkie knew or believed that the officers were acting with lawful authority. Wilkie makes a minor mention of "lawful authority" within his sufficiency of the evidence argument, but he fails to develop a separate argument about the State establishing "lawful authority" at trial. The same is true for the knowledge element in the motion to dismiss section of his brief.

The standard for a motion to dismiss and the standard for a challenge to the sufficiency of the evidence at trial are not the same. Wilkie cannot expect either the State or this court to apply his arguments interchangeably, and we will not do so. Wilkie's arguments are undeveloped, and we need not address undeveloped arguments. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992). To the extent that Wilkie attempts to develop an argument in his reply brief that "[t]he complaint did not establish probable cause that Wilkie knew or believed he was obstructing an officer acting with lawful authority," we need not address arguments raised for the first time in a reply brief. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998).

As to Wilkie's claim that the State's "response addresses only information in the complaint," we conclude that the State's response was proper. A motion to dismiss tests the sufficiency *of the complaint*, even for a criminal complaint. *See State v. Haugen*, 52 Wis. 2d 791, 793, 191 N.W.2d 12 (1971). As our supreme court explained,

> Evidence adduced at a subsequent trial cannot be used to supply the factual deficiencies of a complaint. As we frequently held, a complaint, including documents that are made a part of it by reference, is a self-contained charge, and it alone may be considered in determining probable cause. Within the four corners of the document must appear facts that would lead a reasonable [person] to conclude that probably a crime had been committed and that the defendant named in the complaint was probably the culpable party.

11

> [A] caller had reported that a male and female were screaming at each other inside the residence. The caller further reported hearing loud banging noises, which he believed to be from a physical altercation between the male and female subjects, and heard the female repeatedly screaming, "Stop" and "no."
>
> ....
>
> Officer Meincke reports that he spoke via phone with [the neighbor], who advised that he lives in the other half of the duplex, with a shared wall with [Wilkie]. [The neighbor] stated that just prior to calling 911, he heard a male and female loudly arguing and screaming at each other. He further indicated that he also heard loud banging noises, which he believed to be someone being struck or thrown to the ground. [The neighbor] also noted that during that time, the female voice had been repeatedly screaming, "No!" and "stop," and that he believed the female was being attacked and harmed by the male, which prompted the 911 call.[11]

*Id.* (citation omitted). To the extent Wilkie asserts that the State failed to address his *Franks*/*Mann* arguments on appeal, based on our review of Wilkie's brief-in-chief, beyond one citation to the general standard in *Mann*, Wilkie did not develop an argument on appeal that the State may have improperly excluded information from the probable cause section of the complaint. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *State v. Mann*, 123 Wis. 2d 375, 385-86, 367 N.W.2d 209 (1985). Accordingly, Wilkie's argument is either undeveloped or underdeveloped, and we will not further address it. *See Pettit*, 171 Wis. 2d at 646-47; *Papa v. DHS*, 2020 WI 66, ¶42 n.15, 393 Wis. 2d 1, 946 N.W.2d 17 (declining to address an underdeveloped argument).

[11] In the "Statement of the Case and Facts" section of Wilkie's brief-in-chief, he observes that "[t]he complaint discusses a phone call between Meincke and [the neighbor] about [the neighbor's] belief that a female was being attacked but omits the fact that the phone call occurred after the officers arrested Wilkie and spoke to [Sabrina]." To the extent that this statement is meant to suggest that the second phone call between law enforcement and the neighbor is irrelevant to our analysis, we disagree. First, the information was reported in the criminal complaint, and we are able to review information contained within the four corners of the complaint to determine whether that information would allow a reasonable person to conclude a crime had been committed and whether Wilkie was probably the person who committed it. *See State v. Chagnon*, 2015 WI App 66, ¶7, 364 Wis. 2d 719, 870 N.W.2d 27.

¶20 The complaint further noted "that [Wilkie] was told that officers would like to speak with the individuals inside the residence and to make sure that everyone was safe" but "that the defendant would not let officers inside." When Wilkie was then "asked to have those inside come out so that officers could speak with them outside," the complaint stated "that the defendant also refused to let anyone come outside of the residence." Finally, the complaint reported "that the defendant was told to step away from the door so that officers could go inside and verify everyone's safety, but the defendant refused and wanted to go back inside the residence."

¶21 We conclude that the circuit court properly denied Wilkie's motions to dismiss and motion for reconsideration because, under the facts alleged in the complaint, the emergency aid exception permitted warrantless entry into Wilkie's residence. Here, the officers received a dispatch report that "male and female subjects" were "screaming at each other inside the residence." That information, alone, may not have been sufficient to invoke the emergency aid exception, but the

---

Second, the 911 call occurred before law enforcement encountered Wilkie at his home, and this later discussion with law enforcement merely provides further context for that 911 call. Although the neighbor did not tell the 911 operator that he believed that the noises he heard were "someone being struck or thrown to the ground" or that "the female was being attacked and harmed by the male"—as the neighbor did in the second call—that was certainly a reasonable inference based on what the neighbor did tell the 911 operator. For example, the neighbor told the 911 operator that "my neighbors are fighting it's getting like fairly aggressive. I keep hearing her scream like 'no, stop' and I keep hearing a lot a banging." He then said, "[T]here's a lot a banging[,] a lot a screaming, I, I've heard her scream no a couple a times. I've heard her scream stop. I have no—I don't know what they're doing, they fight all the time but it doesn't normally get this loud." The neighbor then agreed with the 911 operator that it "sounds like it's physical."

Finally, even if we were to completely disregard the information regarding that second phone call and only rely on the information contained in the 911 call as outlined in the complaint, which was known to law enforcement before they encountered Wilkie, *see State v. Gant*, 2015 WI App 83, ¶12, 365 Wis. 2d 510, 872 N.W.2d 137 (noting that under the collective knowledge doctrine, a court may take into account the collective knowledge of the police department), we conclude that the 911 call supports a finding that the emergency aid exception applies.

neighbor also "reported hearing loud banging noises, which he believed to be from a physical altercation …, and heard the female repeatedly screaming, 'Stop' and 'no.'" With those added facts, an objectively reasonable inference, based on the female's pleas for the male to stop, was that the female was being physically assaulted and injured by the male inside the residence.

¶22 Then, when officers arrived on the scene, Wilkie not only denied them access to the home, but he also denied the officers face-to-face contact with the other individuals in the home. From an objective perspective, it would have been reasonable to simply allow the family members to speak with the officers to resolve their concerns stemming from the neighbor's report, even if that discussion occurred outside of the home. Thus, it was reasonable to infer that Wilkie may have been denying access to the home, and to the individuals inside the home, because one of them was severely injured or worse. As Meincke testified, Wilkie "refusing to let people come to the door cause[d] concern." These officers were not required to accept Wilkie's representations and simply walk away without confirming for themselves that the individuals inside the home were safe. Given these facts, and under the totality of the circumstances, we conclude that a reasonable person would have believed that "there was an immediate need to provide aid or assistance to a person due to actual or threatened physical injury" and "that immediate entry into an area in which a person has a reasonable expectation of privacy was necessary in order to provide that aid or assistance." *See Ware*, 400 Wis. 2d 118, ¶22 (citation omitted).

¶23 Wilkie attempts to downplay the objective facts known to officers and stated in the criminal complaint by arguing that "the officers were aware of a verbal argument in Wilkie's home," that he came to the door and "explained that nobody was hurt," and that he "told the officers [Sabrina] could come out to talk to the

14

officers but that they needed a warrant to enter." *But see supra* ¶4. We conclude, however, that the neighbor's report and Wilkie's behavior provided much more than "[g]eneralized concerns for safety."[12] While Wilkie focuses on the fact that the neighbor did not specifically state in the 911 call that someone was injured, given "that '[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception,'" the information contained in the 911 call was sufficient to support the applicability of the emergency aid exception. *See id.* (alteration in original; citation omitted).

¶24 Wilkie also challenges the applicability of the emergency aid exception by asserting that the officers could have gone to the back door to attempt to enter the home, but "rather than enter to render immediate aid, the officers chose to engage with Wilkie to 'figure out what's going on.'" Wilkie's argument is not well taken. As Meincke stated during cross-examination, "I'm not going to leave my partner at the front door with somebody who is being uncooperative to go sit at a back door when we don't know what's going on inside, and we have a potential problem, and this seems likely to be our … problem person." Further, whether the officers could have left Wilkie at the front door and entered through the back door has no bearing on whether the officers had lawful authority to enter the home under the emergency aid exception.

---

[12] In his reply brief, Wilkie also makes a brief reference to *State v. Pinkard*, 2010 WI 81, ¶54, 327 Wis. 2d 346, 785 N.W.2d 592, stating that "[e]ven assuming the officers' attempted entry was based on a potential concern about the 'health and safety' of the occupants, they had no lawful authority to enter without some proof of a true emergency." *Pinkard* is a community caretaker exception case, not an emergency aid exception case. *Id.*, ¶1. Further, as outlined above, *see supra* ¶¶17-18, the test to determine whether the emergency aid exception applies does not require "proof of a true emergency." Rather, the reasonable apprehension of the need to provide aid to injured people is already built into the emergency aid exception. Accordingly, *Pinkard* does not help Wilkie.

¶25 In sum, we conclude that a commonsense reading of the allegations in the complaint, along with reasonable inferences from those facts, would allow a reasonable person to conclude that the officers had lawful authority to enter Wilkie's home to render aid to the unknown female under the emergency aid exception to the warrant requirement. Accordingly, the complaint alleged sufficient facts that Wilkie probably obstructed the officers.[13]

## II. Sufficiency of the Evidence

¶26 Next, Wilkie argues that "[e]ven assuming the [circuit] court properly denied Wilkie's motions to dismiss," "there was insufficient evidence [at trial] that Wilkie knew the officers were acting with lawful authority and that Wilkie knowingly obstructed their entry into his home." *See* WIS JI—CRIMINAL 1766; *State v. Lossman*, 118 Wis. 2d 526, 536-37, 348 N.W.2d 159 (1984). Wilkie asserts that "no reasonable jury could be convinced 'beyond a reasonable doubt of the existence of every element of'" obstructing an officer "[b]ecause the totality of the circumstances prove that Wilkie believed the officers' attempted entry into his home was unconstitutional." *See Jackson v. Virginia*, 443 U.S. 307, 316 (1979), *superseded by statute on other grounds*, 28 U.S.C. § 2254(d). For the reasons that

---

[13] Wilkie also faults the circuit court for denying his motion for reconsideration based on the State's assertion that exigent circumstances existed. *See State v. Hughes*, 2000 WI 24, ¶17, 233 Wis. 2d 280, 607 N.W.2d 621 (recognizing an exception to the warrant requirement where the government can show both probable cause and exigent circumstances). Wilkie argues that "[t]here was neither probable cause nor exigent circumstances to justify entry into Wilkie's home."

Given our conclusion above concerning the emergency aid exception and the fact that it is dispositive, we need not reach the question of whether officers also had probable cause and whether exigent circumstances existed. *See State v. Castillo*, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) ("An appellate court should decide cases on the narrowest possible grounds."). Accordingly, we will not address this argument further.

follow, and under our standard of review, we disagree that the evidence presented at trial was insufficient to establish that Wilkie obstructed an officer.

¶27 Our review of a defendant's challenge to the sufficiency of the evidence on appeal "is highly deferential to a jury's verdict." *State v. Beamon*, 2013 WI 47, ¶21, 347 Wis. 2d 559, 830 N.W.2d 681. Under this standard, we will "not reverse a conviction unless the evidence, viewed most favorably to the [S]tate and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). Furthermore, "[i]f any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt," we will uphold the "verdict even if [we] believe[] that the trier of fact should not have found guilt based on the evidence before it." *Id.* at 507. "It is the function of the trier of fact, and not of an appellate court, to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 506. "This high standard translates into a substantial burden for a defendant seeking to have a jury's verdict set aside on grounds of insufficient evidence." *State v. Hanson*, 2012 WI 4, ¶31, 338 Wis. 2d 243, 808 N.W.2d 390.

¶28 In *Lossman*, our supreme court addressed the question of whether the accused's knowledge or belief of lawful authority was a required element of the version of WIS. STAT. § 946.41(1) in effect at the time. *Lossman*, 118 Wis. 2d at 529. There, a police officer executed a traffic stop on a vehicle when it turned down a dirt road, the property owner came out and told the officer to leave his property, and a struggle ensued. *Id.* at 529-31. The court held, based on the plain language of the statute, that the accused's knowledge of lawful authority is an element of the

17

crime of resisting or obstructing an officer. *Id.* at 539-40. According to the court, "the defendant's subjective intent must be ascertained, based on the totality of the circumstances, including what the defendant said or did, what the officer said or did, and any objective evidence which is available." *Id.* at 542-43. The court further observed "that, in weighing the evidence, the jury may take into account matters of common knowledge and experience in the affairs of life." *Id.* at 544. Finally, the court explained that "[t]he accused may not have believed the deputy was acting with lawful authority, but the question is whether a jury, acting reasonably, could be so convinced that the defendant knew the officer was acting with lawful authority."[14] *Id.* at 544-45.

¶29 Based on the evidence presented at Wilkie's trial, we conclude that a jury, acting reasonably, could have determined beyond a reasonable doubt that Wilkie knew, or believed, that the officers were acting with lawful authority when they sought to enter his home. This possibility is true despite Wilkie's protestations against the officers' attempt to enter his home. At trial, the jury was able to hear and observe, from a distance, the entire interaction between law enforcement and Wilkie. The jury heard law enforcement explain to Wilkie that they received a report of sounds and statements suggesting a physical altercation and that they needed to check on the safety of everyone in the house. Importantly, the officers expressed a willingness to speak with the occupants without entering the home, but Wilkie denied them even that type of access. At that time, the officers explained to Wilkie the reason that they were concerned that someone was injured and that they needed to figure out what happened. Only then did the officers tell Wilkie that they

---

[14] WISCONSIN STAT. § 939.23(2) defines "[k]now" as "requir[ing] only that the actor believes that the specified fact exists." *See also* **State v. Lossman**, 118 Wis. 2d 526, 535, 348 N.W.2d 159 (1984).

would be going into his house to "make sure people are okay," after which he refused and the officers told him that "we don't need your permission to go in." The jury also saw him resisting arrest and heard the comments he made after being arrested.

¶30     Under these circumstances, the jury could have reasonably found, based on the facts and inferences from those facts, that Wilkie believed that law enforcement was at his home in their official capacity investigating a report that someone might be injured and in need of aid and that the officers were thus acting with lawful authority.

¶31     Wilkie disagrees, stating that he "correctly told the officers they needed to get a warrant to enter," he explained that no one was hurt, and he tried to end a consensual interaction with law enforcement by stating that he was done talking to the officers. "By asserting his Fourth Amendment rights," Wilkie argues that his "actions reflected his subjective belief that the officers had no lawful authority to enter his home without a warrant." Wilkie further contends that "the [S]tate's sufficiency argument discards Wilkie's subjective intent and assumes the jury could find that he knew police were acting with lawful authority simply because they were police."

¶32     Wilkie's arguments ignore our standard of review. First, as we explained above, had the officers entered Wilkie's home by the time of his arrest, they would not have required a warrant to do so under the emergency aid exception. Second, the court in *Lossman* made clear that ascertaining a defendant's subjective intent is not based only on what he or she says. *See Lossman*, 118 Wis. 2d at 542-43 (totality of the circumstances). Instead, the jury could properly consider the surrounding circumstances to determine Wilkie's knowledge or belief. *See id.*

Further, while Wilkie asserts that "lawful authority" does not simply mean "because they were police," the court in **Lossman** concluded that the jury could properly determine that the defendant knew the deputy was acting with lawful authority after considering the jury heard evidence that "the officer was in full uniform, driving a marked patrol car, which still had its headlights on and red flashing lights, and that the officer told the defendant a traffic stop was in progress." *See id.* at 544-45.

¶33     Third, Wilkie argues that his statements to the officers and his attempt to end their conversation and go inside his home demonstrate that he did not know that the officers had lawful authority to enter his home. While this is one inference that the jury could have drawn based on the evidence, the jury was not required to draw that inference. Further, as we have explained previously, "[o]ur totality of the circumstances discussion does not mean that we accept [the defendant's] apparent premise that a defendant may challenge an obstruction charge based on his or her subjective understanding (or misunderstanding) of whether the police had a legal right to do what they did"; thus, "[e]ven [where a defendant] subjectively believed the deputies needed a warrant to be on his property, he could still 'know[]' that they were acting with 'lawful authority' within the meaning of WIS. STAT. § 946.41(1)." *State v. Stich*, No. 2010AP2849-CR, unpublished slip op. ¶11 n.6 (WI App June 22, 2011).[15]

¶34     Here, the evidence at trial showed that the officers told Wilkie why they were there and why it was important to confirm the safety of everyone in the house; that the officers were in uniform and arrived in police vehicles; that the officers told Wilkie that they did not need permission to enter his home under the

---

[15] Unpublished opinions authored by a single judge and issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

circumstances; that Wilkie was unwilling to allow his family to come talk to the police in lieu of the officers entering the home; that he was uncooperative and confrontational; and that Wilkie made numerous disdainful comments and threats toward the police. All of these facts support the jury's finding that Wilkie, in fact, knew the officers were acting with lawful authority. There is no dispute that the State proved the other elements of the obstructing charge. Therefore, the evidence was sufficient to support the jury's verdict.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.